452 P.2d 993

**UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation, and Clyde Graham, Plaintiffs-Appellants,**

v.

**CLOVER CREEK CATTLE COMPANY, a Corporation, Defendant-Respondent.**

No. 10114.

Supreme Court of Idaho.

March 21, 1969.

Rehearing Denied April 21, 1969.

Moffatt, Thomas, Barrett & Blanton, Boise, for plaintiffs-appellants.

Dunlap, Rettig & Rosenberry, Caldwell, Schroeder, Denning & Hutchens, Vale, for defendant-respondent.

McQUADE, Justice.

The district court disposed of this case on a motion for summary judgment. For the purposes of determining whether this disposition was proper, respondent Clover Creek Cattle Company does not take issue with appellants' summary of the facts, which is as follows:

" 'At all times material herein, United States Fidelity and Guaranty Company was a corporation organized under the laws of the state of Maryland and authorized to engage in the business of writing surety bonds in the State of Idaho * * *; Clyde Graham was a citizen and resident

of the State of Idaho engaged in the business of buying livestock as agent for various purchasers * * *; and Clover Creek Cattle Company was an Oregon corporation engaged in the business of producing and raising livestock, with principal place of business in Malheur County, Oregon * * *. Bert W. Hawkins is, and at all material times was, president of Clover Creek Cattle Company * * *.

" 'Clyde Graham was registered as a dealer with the United States Department of Agriculture, Packers and Stockyards Division, pursuant to the provisions of the Packers and Stockyards Act, 1921 (7 U.S.C.A. 181, et seq.) and regulations promulgated by the United States Department of Agriculture under that Act * * *. Pursuant to the said Act, he filed with said Department a livestock dealer's bond, No. 69326–13–62, in the amount of $11,000.00, issued by United States Fidelity and Guaranty Company, naming Graham as principal and naming Wallace A. Sorensen, a citizen and resident of Idaho, as trustee * * *, a true copy of the bond being attached to the complaint as Exhibit 'A' * * *.

" 'About April 15, 1964, Clover Creek Cattle Company transported some 300 of its cattle into Idaho for pasturage near New Meadows during the 1964 summer season. At the close of the season, about September 20, 1964, it took the cattle to a feedlot near Eagle, Idaho, to be fattened for sale * * *. The feedlot, known as the D & D Feeder Company, was operated by one Don J. DeChambeau * * *. The cattle remained in Idaho at the feedlot at all times until their sale in January and February, 1965 * * *.

" 'Meanwhile, sometime in early or mid-January, 1965, Clyde Graham, in the course of his business as a commissioned cattle buyer, entered into an oral agreement with Ben Allustiarte, president of Modesto Meat Company, Inc., of Modesto, California, whereby Graham was to buy for Modesto Meat Company, Inc., as its agent, some two thousand head of slaughter cattle * * *. By this agreement, Graham was to pay up to twenty-two cents (later raised to twenty-three cents) per pound for the cattle * * *. Graham was to ship the cattle, as he purchased them, to Modesto, California * * *. His compensation for his services was to be a commission of twenty-five cents per hundred pounds of cattle purchased, to be paid, like the payments for the cattle, by draft drawn against Modesto Meat Company, Inc., by Clyde Graham * * *.

" 'Sometime after the above agreement with Modesto Meat Company, Inc., and before January 21, 1965, Clyde Graham was at the D & D Feeder Company lot in Eagle, Idaho, purchasing cattle owned by one Joe Van Leith * * *. While Graham was at the feedlot, DeChambeau told him that he had some 300 head of cattle owned by Bert Hawkins (Clover Creek Cattle Company) and asked Graham if he could use them * * *. Graham looked at the cattle and said he could use them, at twenty-two cents a pound, as they became ready over a period of time * * *. DeChambeau then told Graham he would call Hawkins and confirm the sale * * *. DeChambeau thereafter phoned Hawkins and told Hawkins of his contract with Graham, including the price which Graham was to pay for the cattle * * *.

" 'A day or two later, Graham was at the Ontario Livestock Commission Company saleyard at Ontario, Oregon, and, by chance, met Hawkins * * *. Hawkins had not previously done business with Graham but knew him to be a cattle buyer who generally purchased cattle as an agent for others * * *. Graham asked Hawkins if DeChambeau had the authority to sell the cattle * * *. Hawkins told Graham that DeChambeau had called him * * *. According to Hawkins' version of the conversation, which is accepted for purposes of this motion only, he and Graham then discussed the price of the cattle and agreed on a price of twenty-two dollars per hundred-weight * * *, and on times of delivery * * *. Graham told Hawkins that he was purchasing the cattle for Mo-

desto Meat Company of Modesto, California, which he described as a 'real good outfit' * * *. Graham told Hawkins that the cattle were not all ready at once and that he would take them in shipments as they became ready, with a deadline of about February 15 * * *.

" 'Graham was to pick the cattle he wanted for each shipment and was to take delivery of them at the Eagle, Idaho, feedlot * * *. Graham was to pay for the cattle at the time of each delivery, by draft drawn on Modesto Meat Company * * * and was to make all arrangements for transportation of the cattle to Modesto, California * * *. Graham, or at least someone other than Clover Creek Cattle Company, was to pay for the transportation to California * * *.

" 'From time to time thereafter, at Eagle, Idaho, Graham purchased or took delivery of certain of the Clover Creek Cattle Company cattle located at the D & D Feeder Company feedlot, as follows * * *:

(1) January 21, 1965 – 72 head, at a purchase price of $18,264.62.

(2) February 7, 1965 – 35 head, at $9,134.00.

(3) February 16, 1965 – 38 head at $9,280.04.

(4) February 17, 1965 – 39 head at $9,349.78.

(5) February 22, 1965 – 98 head at $24,123.22.

At the time of delivery of each lot of cattle, at Eagle, Idaho, Graham delivered to Hawkins or a designated agent of Clover Creek Cattle Company at Eagle, Idaho, a draft in the amount of the purchase price, drawn against Modesto Meat Company by Clyde Graham and payable through Crocker Citizens Bank, Modesto, California * * *. The cattle were delivered to Graham at the Eagle, Idaho, feedlot and shipped by him, via authorized Idaho livestock truckers, to Modesto Meat Company at Modesto, California * * *. Prior to each shipment at the Eagle, Idaho, feedlot, a brand inspection was performed on the cattle pursuant to Idaho law, by an inspector from the of-fice of the Idaho State Brand Inspector * * *.

" 'After delivery of the drafts to Clover Creek Cattle Company at Eagle, Idaho, the same were presented for payment in due course. The draft covering transaction (1) was duly paid, but at the time of his delivery or deposit of drafts (4) and (5) to his bank, Hawkins was informed that draft (2) had not yet been paid. On or about February 22, 1965, Hawkins contacted the United States National Bank of Oregon, Ontario Branch, and was informed (after a telephone call to the Crocker Citizens Bank at Modesto, California) that Modesto Meat Company appeared to be a responsible organization. Hawkins thereafter tele-phoned Clyde Graham and informed him that draft (2) had not been paid * * *. At Graham's suggestion, Hawkins then met with Graham and Ben Allustiarte, president of Modesto Meat Company, at the Boise airport and was assured by Allustiarte that Allustiarte would look into the matter when he got back to California * * *.

" 'Thereafter Hawkins traveled to Modesto, California, with his attorney and met with Allustiarte * * *. At that time Hawkins received payment for draft (2) and some ten days later received payment for draft (3) * * *. As detailed below, he also received from Allustiarte a prom-issory note in the amount of drafts (4) and (5). Drafts (4) and (5) remain unpaid and are the subject of the present action.

" 'Draft (4) * * *, in the amount of $9,349.78, was issued to Clover Creek Cattle Company at Eagle, Idaho, on Feb-ruary 17, 1965, in payment for 39 head of cattle delivered to Graham. Graham made out the draft in his own handwriting and affixed his signature to said instrument after the words 'Modesto Meat By.' * * *. The instrument was signed at the line marked 'Seller' with the words 'Clover Creek Cattle Co. Roy F. Lane,' said Roy F. Lane being a bookkeeper for D & D Feeder Company and a duly authorized agent of Clover Creek Cattle Company for purposes of completing the transaction * * *.

" 'Draft (5) * * *, in the amount of $24,123.22, was issued to Clover Creek Cattle Company at Eagle, Idaho, on February 22, 1965, in payment for 98 head of cattle delivered to Graham. Graham made out the draft in his own handwriting and affixed his signature to said instrument after the words 'Modesto Meat Co. By.' * * *. The instrument was signed at the line marked 'Seller' by Bert W. Hawkins, who was present in Eagle, Idaho, at the time of the delivery * * *.

" 'As noted above, on or about March 8, 1965, Clover Creek Cattle Company obtained from Ben Allustiarte a promissory note due April 22, 1965, in the amount of $33,549.80, the total amount of the two unpaid drafts, plus interest. * * *. Said note has not been paid, and on or about May 7, 1965, Clover Creek Cattle Company instituted an action against Modesto Meat Company, Inc., and Ben Allustiarte in the Superior Court of the State of California, in and for the County of Stanislaus * * *. The complaint filed by Clover Creek Cattle Company alleges the delivery of the above-mentioned drafts to Clover Creek Cattle Company by Clyde Graham as authorized agent of Modesto Meat Company in payment for the aforesaid cattle, and also alleges the above-mentioned promissory note executed by Ben Allustiarte (Ibid). It also alleges, at paragraphs V and VII thereof that said cattle were purchased at Eagle, Idaho, by Modesto Meat Company, through its agent, Clyde Graham * * *.

" 'On or about October 6, 1965, a judgment was entered in said California Court adjudging Modesto Meat Company, Inc., and Ben Allustiarte jointly and severally liable to Clover Creek Cattle Company in accordance with the prayer of said complaint * * *. The judgment, a certified copy of which is attached to plaintiffs' motion for summary judgment * * *, has not been satisfied.

" 'On or about June 22, 1965, Clover Creek Cattle Company made written demand upon Clyde Graham and United States Fidelity and Guaranty Company for payment of the sum of $33,473.00 arising from non-payment of the two drafts and the non-payment of the purchase price for the subject cattle * * * and on or about November 17, 1965, gave written notice to trustee Wallace A. Sorensen of its intention to maintain an action in its own name against Clyde Graham and United States Fidelity and Guaranty Company upon the aforementioned bond * * *. United States Fidelity and Guaranty Company denied the claim * * * and on January 19, 1966, Clyde Graham and the United States Fidelity and Guaranty Company filed the instant action for declaratory relief in this Court.' " (Appellants' Br. pp. 3–9).

" * * * The complaint was filed against the named trustee in said bond and the respondent Clover Creek Cattle Company, alleging threats of suit against appellants by respondent and seeking adjudication that neither appellant was liable to respondent in any sum. * * * Respondent filed an amended answer and counterclaim, seeking recovery against appellant Graham in the sum of $33,473.00 (the sum of the unpaid drafts) and against appellant United States Fidelity and Guaranty Company in the sum of $11,000.00 (the face amount of its bond), plus $5,000.00 attorney fees * * *. Appellants replied to the amended counterclaim, denying any liability * * *.

"Appellants moved for summary judgment, based on the pleadings, the depositions of Graham and Bert W. Hawkins (respondent's president) and other records and files in said case, on the grounds that there were no genuine issues as to any material fact and that appellants were entitled to judgment as a matter of law * * *. The matter was briefed and argued to the trial court, and on May 9, 1967, the court issued its memorandum decision announcing that it would grant a summary judgment to respondent to the amount of the bond ($11,000.00), but in appellant Graham's favor as to amounts claimed in excess of the bond * * *. The decision did not discuss the issues of interest and attorney's fees, and the same were thereafter argued

to the court on June 12, 1967 * * *. On June 26, 1967, the trial court issued its memorandum decision concluding that respondent was entitled to attorneys' fees in the sum of $3,750.00 * * * and on July 5, 1967, it made and entered an order and summary judgment denying appellants' motion for summary judgment and granting judgment in favor of respondent and against both appellants in the sum of $11,000.00 plus interest at 6% per annum from December 15, 1965, in the sum of $1,029.84, and costs and against appellant United States Fidelity and Guaranty Company in the further sum of $3,750.00 as attorneys' fees * * *. Appellants have now appealed from this judgment.

"The trial court's judgment also dismissed the action as against original co-defendant Wallace A. Sorensen, the trustee named in the bond, who had appeared by way of answer disclaiming all right and interest in the proceedings * * *. Appellants do not appeal from the dismissal of defendant Sorensen." (Appellants' Br. pp. 1–3).

The central issue in this case is whether Graham's bond covers the livestock transaction which gave rise to Clover Creek's loss. The briefs and arguments of the parties on this issue have disclosed that there is only a narrow area of disagreement. Appellant surety company and its principal have argued that, under general concepts of agency, contract and suretyship law, Clyde Graham in no way became personally liable to Clover Creek Cattle Company for the purchase price of the cattle. This is true, it argues, because Clyde Graham acted as an agent for a principal, Modesto Meat Company, who was fully disclosed to the Clover Creek Cattle Company as the ultimate purchaser of the cattle, and an agent of a fully disclosed principal does not become a party to the contract unless he agrees independently to become bound.

Respondent Clover Creek Cattle Company has conceded in its brief and argument that appellants' argument above, so far as it goes, has merit. Respondent then proceeds to argue that, under the Packers and Stockyards Act, 7 U.S.C.A. §§ 181–231, 42 Stat. 159 (1921), and the regulations promulgated thereunder relative to market agency and dealer bonds, 9 C.F.R. §§ 201.29–201.34 (1965), then in force, Clyde Graham did indeed create an independent obligation to pay for all cattle purchased by him for Modesto in this case. This is true, it argues, because Clyde Graham was a registered livestock dealer who was required to post a bond guaranteeing " * * * pay[ment], when due, to the person or persons entitled thereto the purchase price for all livestock purchased by [him] * * *." For its part, appellant surety company concedes that Clyde Graham acted in his capacity as a registered dealer in procuring the cattle for Modesto, but contends that the bonding requirement imposed no personal obligation upon him to pay for all cattle handled by him in all circumstances.

Thus, each party has sought to maneuver the controversy into the legal territory of its greatest strength. As we view the facts, the central and controlling question in the case is whether Graham's bond constituted an independent promise to pay for all cattle handled by him. The Packers and Stockyards Act, under which bonds are demanded of livestock dealers, is remedial legislation which grew out of efforts to correct certain of the evils which then existed in the livestock industry.[1] As the Supreme Court noted in Stafford v. Wallace,[2]

"The object to be secured by the act is the free and unburdened flow of livestock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers

---

1. Bowman v. United States Department of Agriculture, 363 F.2d 81 at 85 (5th Cir. 1966) ; United States v. Marshall Durbin & Co. of Haleyville, Inc., 363 F.2d 1 at 4 (5th Cir. 1966).

2. 258 U.S. 495 at 514–516, 42 S.Ct. 397 at 401, 66 L.Ed. 735, 23 A.L.R. 229 (1922).

on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still, as livestock to the feeding places and fattening farms in the Middle West or East for further preparation for the market."

Contributing to the evils to be corrected by the passage of the Act were the facts that "[t]he shipper, whose livestock are being cared for and sold in the stockyards market is ordinarily not present at the sale, but is far away in the West. He is wholly dependent on the commission men. The packers and their agents and the dealers who are the buyers, are at the elbow of the commission men, and their relations are constant and close." [3]

In the course of the half century since the passage of the act, many changes have taken place to make this portrait inaccurate in its detail, but its thesis remains valid even in the present state of the industry. At present, there are many more livestock markets scattered across the nation than the few great, central markets that existed in the past. Moreover, there is a trend toward "country buying" in which packers and livestock dealers buy directly from the producer, thus, avoiding the public stockyard or market.[4] Yet, because the meat packers remain near the large urban areas some distance from the producers' farms and ranches, one aim of the legislation in this area is still, as it was when Chief Justice Taft wrote the *Stafford* opinion, that of making the financial and marketing structure of the livestock industry responsible to the livestock producers. It is with these considerations in mind that we turn to the pertinent statutes and regulations.

Clyde Graham was a "dealer" (7 U.S.C.A. § 201[d]) who engaged in a "livestock" (7 U.S.C.A. § 182 [4]) transaction in "commerce" (7 U.S.C.A. § 183) in this case. As such, he was required to be and was in fact registered with the Sec-

retary of the Department of Agriculture under 7 U.S.C.A. § 203. He also was required to be and was in fact bonded pursuant to 7 U.S.C.A. § 204, which provides in part that "the Secretary may require reasonable bonds from every market agency and dealer, under such rules and regulations as he may prescribe, to secure the performance of their obligations * * *." The Secretary's regulation, 9 C.F.R. § 201.31 as revised on January 1, 1965, provided in pertinent part as follows:

"Each * * * dealer bond shall contain conditions applicable to the activity or activities in which the person or persons named as principal in the bond propose to engage, which conditions shall be as follows or in terms to provide equivalent protection.

\*　　\*　　\*　　\*　　\*　　\*

"(c) When the principal operates as a dealer (trader):

'If the said principal shall pay, when due, to the person or persons entitled thereto the purchase price for all livestock purchased by said principal.' "

Pursuant to this regulation, Graham's bond, on which appellant Fidelity is secondarily liable, contained the following language:

"If the said Principal shall pay, when due, to the person or persons entitled thereto the purchase price for all livestock purchased by said Principal; thence this bond shall be null and void; otherwise to remain in full force and virtue."

Thus, we come to the precise issue in the case: does the language create a personal liability in Graham to the extent of his bond for the payment for cattle he purchases for a disclosed principal?

■ The district court concluded, on the basis of the policy considerations underlying the provisions of the Packers and Stockyards Act, that the crucial provision of the bond must be read as a blanket guarantee of payment of the purchase price of

3. Id.

4. See H.R.Rep. No. 1048, 85th Cong., 2nd Sess. 5214–5216 (1958).

all the cattle a dealer purchases including those purchased for a disclosed principal. We agree with this conclusion. It may be noted that there are at least three possible types of transaction in which a dealer like Graham might engage. He could purchase cattle for an undisclosed principal. In such a case, the dealer would be liable as a party to the sales contract for the price of the cattle under normal agency concepts.[5] This result was reached in Bottorff v. Ault,[6] where a livestock dealer who did not fully and specifically disclose the identity of his principal until after the sale was concluded was held liable for the price of the livestock purchased to the extent of his bond. Secondly, a dealer could purchase livestock for his own account. In that case the dealer clearly would be liable for the purchase price, and his bond would apply. This case presents the third situation, that is, where the dealer purchases livestock for a fully disclosed principal. Appellant Fidelity argues that, though its bond covers the first two types of transaction, it does not cover this type. It relies upon the *Bottorff* case where it was stated by way of *dicta* that "[t]o avoid liability it was incumbent on [the dealer] to disclose the name and identity of his principal clearly before and not after the sale was concluded."[7] Though appellants have not so sharply focused their argument, they appear to argue that a dealer can never "purchase" livestock within the meaning of the phrase, "purchased by said Principal," as it appears in the bond and the Secretary's regulations, when he fully discloses the name of his principal as the ultimate buyer of the livestock. Our task in this case is thus initially that of determining what meaning must be attributed to the word, "purchased," in the context of the federal act and regulations.

The rationale of the *Bottorff* Court was that, when a dealer purchases livestock for a fully disclosed principal, it is not the dealer who purchases it for purposes of the bond but rather the principal who does so. Apparently that Court reached this conclusion by a reference to the law of agency, which generally indicates that the principal and not the agent is liable on contracts made by the agent for his disclosed principal.[8] Respondent contends, however, that it would defeat the purposes of the act to read the bond provision as excluding protection of livestock producers in those cases where the identity of the ultimate purchaser is disclosed by the order buyer. Respondent points out that the language of the required condition clause in the bond is unlimited on its face and argues that it should be construed liberally to effect the remedial purposes of the act.

The regulations do not define the word, "purchase," and in the circumstances of this case, the meaning of the word is ambiguous. "Purchase" has been defined as the "transmission of property from one person to another by voluntary act and agreement, founded on a valuable consideration."[9] The verb "purchase" has been defined as "to obtain [anything] by paying money or its equivalent: buy for a price * * *."[10] Some of its synonyms are "acquire, bargain for, barter for, buy, get, obtain, procure [or] secure."[11] The activities of an order buyer like Graham fall within these definitions of "purchase," even in the class of situations in which he "purchases" for a disclosed principal. Such an agent-dealer arranges for the acquisition of the cattle. He obtains control of the livestock in an immediate sense by giving something of value for it and effectively removes it from the possession and control

5. See Restatement (Second) of Agency § 322 (1957); Seavey, Agency § 123(A) (1964).

6. 374 F.2d 832 (7th Cir. 1967).

7. Id. at 835.

8. See Restatement (Second) of Agency §§ 144, 320, 328 (1957); Seavey, Agency §§ 70(D), 123 (1964).

9. Black's Law Dictionary (4th ed. 1951).

10. Webster's Third New International Dictionary (1967).

11. Fernald, English Synonyms, Antonyms and Prepositions 395 (1914).

of the livestock producer. Though such a dealer is not the ultimate purchaser, yet his functions are injected into these transactions in a manner significant enough to constitute them as his "purchases" for the purposes of his bond.

Turning to the statutory context, the term "dealer" is defined by 7 U.S.C.A. § 201(d) as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, *either* on his own account or *as the employee or agent of the vendor or purchaser*." (Emphasis added). This language makes no distinction between dealers acting as agents for disclosed purchasers and those acting for undisclosed purchasers. This definition was given a literal and expansive interpretation by then U. S. Attorney General Sargent.[12] The bond provision prescribed by the regulations must be construed as guaranteeing payment for all "purchases" by such "dealers," whether made for disclosed or undisclosed principals.[13]

This is also the purport of the Secretary's regulations as applicable to the case at bar which provide in part that every livestock dealer shall maintain a reasonable bond "to secure the performance of *obligations incurred as such * * * dealer * * *.*"[14] (Emphasis added). These obligations include all of the responsibilities which attach to a dealer when he transacts business as " * * * agent of the * * * purchaser."[15] The 1939 version of the bonding regulations actually incorporated the statutory "dealer" definition, making it amply clear that the bond applies to all obligations incurred by a dealer buying livestock as

agent for all purchasers in unqualified terms.[16] In these circumstances, the word "purchased" must be given a construction broadly consonant with the remedial purposes of the act.

■ For these reasons, we find that the language of Clyde Graham's bond constitutes an independent promise by him to guarantee payment to the extent of his bond ·for all cattle purchased by him for himself or for disclosed or undisclosed principals. In all three types of transacaction, the existence of the bond is the only reliable guarantee that the livestock producer will be paid. A producer may rely to some extent upon the reputation (if any) of the disclosed principal for financial security. Yet the speed with which livestock transactions may be consummated may prevent any effective utilization of such information. Hence the bond is the most certain means of insuring the free flow of livestock in commerce.

■ Appellant surety has asserted that this interpretation runs contrary to the fundamental suretyship law concept that the surety may not be found liable until its principal is independently found liable. It argues that this result makes liability turn upon whether or not the bond exists. That is not our view. Appellant concedes the validity of the rule that, when an agent assumes a personal obligation in relation to a contract, he may be held liable upon that obligation even though the principal he represented in the formation of the contract is disclosed. In the instant case, the Secretary of Agriculture has imposed upon registered livestock dealers an implied obligation to guarantee payment for all live-

12. 35 Opinions of Attorneys General of the United States 47 at 52, 54 (1926) ; compare this inclusive definition of livestock "dealer" with the two terms used to describe persons transacting business in securities under the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78c(a) (4) and (5) : a "broker" affects transactions for the accounts of others, while a "dealer" buys and sells for his own account.

13. Respondent urges that 7 U.S.C.A. § 223 makes an agent-dealer liable equally with his principal-packer, but we view that section as merely a restatement in the context of the act the rule that a principal is liable for the acts of his agent.

14. 9 C.F.R. § 201.29; the regulations have long included these terms: see 9 C.F.R. § 201.20(a) (1938).

15. 7 U.S.C.A. § 201(d).

16. 9 C.F.R. §§ 201.20(a) and (b) (1939).

stock purchased by them. This obligation is implied from the fact that the execution of the bond is a condition precedent to the required registration as a livestock dealer. We have already decided that the term "purchased" as used by the Secretary in the regulations has a broader meaning than that of merely referring to the acts of the ultimate purchaser in a livestock transaction. The term also includes a reference to the actions of an agent-dealer when he takes immediate control of the livestock and begins the process of payment on behalf of a disclosed principal. Thus, the Secretary has imposed upon livestock dealers as a matter of federal administrative law a responsibility for payment for all livestock so purchased by them. It is this prior obligation which makes the dealer liable if his disclosed principal fails to pay. It is only then that the surety becomes secondarily liable upon the bond which guarantees the performance of the dealer's obligation.

■ Nor does the fact that the dealer's liability as measured by the amount of the bond require a different conclusion. The intent of the bonding requirement is to make the dealer strictly liable to the extent of the amount of the bond in all cases in which the livestock producer is not paid for cattle purchased by the dealer. The Secretary prescribes the amount of purchase obligations guaranteed by the dealer by regulating the bond provisions. The guaranteed amount must correspond to the amount of business the dealer transacts.[17] Though the amount of the dealer's liability is determined by reference to the bond, the fact of liability itself derives from the dealer's obligation to pay for what he purchases. These provisions reflect the Secretary's conclusion that, as between the dealer-agent and the livestock producer, it is the dealer-agent who bears the burden of insuring the financial responsibility of the purchaser of

livestock whether the latter is the dealer himself or a disclosed or undisclosed third party. If the dealer-agent does not have reliable knowledge of his principal's financial responsibility, then he takes the risk that he will become liable upon his principal's failure to pay.

■ Appellant argues that the legal incidents of the use of the word "purchased" in the regulations and the bond must be referred to the state law of agency rather than to federal administrative law. It argues that the Packers and Stockyards Act was not intended to preempt all state law relevant to the rights and liabilities of parties to livestock transactions. We may agree that state law governs some questions arising under the act without concluding that it governs the construction of the language in a bond specifically demanded by federal regulations promulgated by the Secretary pursuant to the rule-making powers given him by Congress. Three of the cases cited by appellants [18] for the proposition that state law must govern this controversy each held a bonded market agency liable for conversion of livestock which it had sold after receiving it from a person who originally acquired it with a bad check. The courts rejected the contention of the market agencies and their sureties that the act provided them with an immunity from the state law of conversion of personal property. The difference between those cases and the case at bar is simply that they did not deal with an area of law covered by regulations of the Secretary.

In the case at bar, the controversy is over the meaning of a bond provision prescribed by federal regulations. We therefore must construe it in conformity with such federal authority as there is. To the extent that implications from *dicta* in the *Bottorff* case are to the contrary, we do not accept them. The reasoning of the cases cited by respondent indicates that

17. See 9 C.F.R. § 201.30 (1968).

18. De Vries v. Sig Ellingson & Co., 100 F.Supp. 781 (D.Minn.1951), aff'd, Sig Ellingson & Co. v. De Vries, 199 F.2d 677 (8th Cir. 1952); Sig Ellingson & Co. v. Butenbach, 199 F.2d 679 (8th Cir. 1952), cert. den. 344 U.S. 934, 73 S.Ct. 505, 97 L.Ed. 719; Adams v. Greeson, 300 F.2d 555 (10th Cir. 1962).

questions arising upon bonds required by the Secretary are to be decided according to federal law. In Lewis v. Goldsborough,[19] the Court stated that its jurisdiction of a case involving a market agency bond "is not based upon diversity of citizenship, but is founded upon a bond executed under the laws of the United States [citation omitted], and the rights of the parties must be determined upon federal law rather than state law, Liebman v. United States [for use and Benefit of Cal. Elec. Supply Co.,] 153 F.2d 350 (9th Cir. 1946)." In Hartford Accident and Indemnity Company v. Baldwin,[20] the same Court and judge who decided the *Ellingson* cases relied upon by appellant held that, in the action to recover upon a livestock dealer's bond containing the same provision at issue here, "[t]here was federal jurisdiction because the bond sued on was executed under the laws of the United States." The Court of Appeal in Daugherty v. White[21] reversed the district court decision relating to market agency and dealer bonds because it failed to "give full consideration to the regulations of the Department of Agriculture promulgated under the Act * * *." We are persuaded that if such issues constitute "federal questions" for the purposes of federal jurisdiction,[22] their resolution must be referred to federal law whenever possible. For that reason, we believe that strict principles of the common law of agency must defer to the meaning of the term "purchased" as used in federal administrative law and as broadly construed to include the acts of the registered livestock dealer in this case.[23]

■ Several subsidiary issues remain for decision. Appellant contends that Clover Creek elected an exclusive remedy when it took the note in the amount of the unpaid drafts from Modesto Meat Company and its president, Ben Allustriate, and on that basis subsequently recovered judgment in the California courts against Modesto. Respondent argues that the election of remedies doctrine does not apply to the instant case to bar recovery against Clyde Graham and his surety because their obligation under federal law exists independently of Modesto's contract liability. We agree with respondent's contention.

In the case of Largilliere Co., Bankers v. Kunz,[24] the Court noted that there were three conditions essential to the proper application of the rule on election of remedies:

"(1) There must be in fact two or more coexisting remedies between which the party has the right to elect; (2) the remedies thus open to him must be inconsistent; and (3) he must, by actually bringing his action or by some other decisive act, with knowledge of the facts, indicate his choice between two inconsistent remedies."

It was noted that the term election of remedies is "generally limited to a choice by a party between inconsistent remedial rights; the assertion of one being necessarily repugnant to or a repudiation of the other."[25]

In the case at bar, neither the first nor the second conditions are fulfilled. First, Clover Creek's pursuit of its contract remedy against Modesto does not constitute a repudiation of its federally-provided remedy against Clyde Graham and his surety. The two remedies proceed from different sources. Graham's obligation to guarantee payment for all his livestock purchases derives from the special regulations imposed

19. 234 F.Supp. 524 at 529 (E.D.Ark. 1964).
20. 262 F.2d 202 at 203 (8th Cir. 1958).
21. 335 F.2d 94 (10th Cir. 1964).
22. See 28 U.S.C.A. § 1331.
23. Cf. Fireman's Fund Ins. Co. v. Abilene Livestock Auc. Co., 391 S.W.2d 147 (Tex. Civ.App.1965), wherein a very similar dealer's bond executed under prior regulations was broadly construed to cover purchases by a dealer which might technically have been excluded from coverage.
24. 41 Idaho 767 at 772, 244 P. 404 at 405 (1925).
25. Id.; this statement of the doctrine was reaffirmed in First Nat. Bank v. Peterson, 47 Idaho 794 at 801, 279 P. 302 at 304 (1929).

·by the Department of Agriculture, while Modesto's obligation to pay for the cattle it acquired derived from the general law of sales. Since the two remedies are independently applicable, respondent's acquisition of an unsatisfied judgment against Modesto does not preclude an action against Graham.

Secondly, as we have analyzed the livestock dealer's federal obligation to guarantee payment for all his purchases as agent for a fully disclosed principal, that responsibility attaches only in the event that the disclosed principal fails to pay. In that event, the dealer becomes liable in the amount of his bond. Thus, the remedy against the livestock dealer and his surety does not "co-exist" with the remedy against the ultimate purchaser but rather only succeeds it. The injured party could not elect it in the first instance. For these reasons the doctrine of election of remedies is not applicable.

█ The next subordinate issue is whether Clover Creek may recover interest on the principal sum of appellants' bond from the date of appellant surety's rejection of Clover Creek's claim, December 15, 1967, as well as from the date of entry of judgment against the surety, July 5, 1967. The district court allowed interest from the former date at the rate of six per cent per annum under I.C § 27–1904, now compiled as I.C. § 28–22–104. The interest was allowed on "money due on the judgment of any competent court or tribunal." Appellant surety apparently argues that, because interest is due on the judgment, it can be allowed only from the date of judgment. We do not agree, for the judgment of the district court also determined that a legal liability attached to appellant surety at the time when Clyde Graham failed to pay for the cattle purchased by him. Clover Creek

acted upon that legal obligation by demanding payment from the surety. The surety then rejected that demand. The surety thus denied on that date what was subsequently found to be due to Clover Creek.

Courts have refused to allow interest from a time prior to judgment when the principal amount of liability was unliquidated.[26] This limitation is apparently based upon equitable considerations. However, where the amount of liability is liquidated or capable of ascertainment by mere mathematical processes as it is here, this Court has allowed interest from a time prior to judgment, for in that event the interest in fully compensating the injured party predominates over other equitable considerations.[27] On that basis, we find no error in the district court's allowance of interest.

The final question for decision is whether respondent Clover Creek properly was awarded attorney fees under I.C. § 41–1839, which provides in pertinent part as follows:

> "41–1839. *Allowance of attorney fees in suits against insurers.*—(1) Any insurer issuing any policy, certificate or contract of insurance surety, guaranty or indemnity of any kind or nature whatsoever, which shall fail for a period of thirty (30) days after proof of loss has been furnished as provided in such policy, certificate or contract, to pay to the person entitled thereto the amount justly due under such policy, certificate or contract, shall in any action thereafter brought against the insurer in any court in this state for recovery under the terms of the policy, certificate or contract, pay such further amount as the court shall adjudge reasonable as attorney's fees in such action.
>
> "(2) In any such action, if it is alleged that before the commencement thereof,

26. Thompson Lumber Co. v. Cozier Container Corporation, 80 Idaho 455 at 461, 333 P.2d 1004 at 1007 (1958).

27. Guyman v. Anderson, 75 Idaho 294 at 296–297, 271 P.2d 1020 at 1021 (1954) (interest allowed on money due on contract from date work completed, reversing allowance only from date of verdict); State v. Title Guaranty & Surety Co., 27 Idaho 752 at 765–767, 152 P. 189 at 193–194 (1915) (interest allowed against surety upon a bond at least from time of demand for payment).

a tender of the full amount justly due was made to the person entitled thereto, and such amount is thereupon deposited in the court, and if the allegation is found to be true, or if it is determined in such action that no amount is justly due, then no such attorney's fees may be recovered.

"(3) * * * This section shall not apply to actions against surety insurers by creditors of or claimants against a principal and arising out of a surety or guaranty contract issued by the insurer as to such principal, unless such creditors or claimants shall have notified the surety of their claim, in writing, at least sixty (60) days prior to such action against the surety. The surety shall be authorized to determine what portion or amount of such claim is justly due the creditor or claimant and payment or tender of the amount so determined by the surety shall not be deemed a volunteer payment and shall not prejudice any right of the surety to indemnification and/or subrogation so long as such determination and payment by the surety be made in good faith. * * *"

The district court determined that the actions of the surety brought it squarely within the terms of the statute in that it re-fused to pay the amount justly due Clover Creek for more than sixty days after receiving written notification of the claim. Nor did the surety tender the full amount justly due Clover Creek before the commencement of the action. Thus, Clover Creek appears to have established its right to a reasonable attorney fee in this action.

■ However, appellant surety argues that the judicial reasoning regarding this statute requires otherwise. In particular, appellant argues that its rejection of Clover Creek's claim was not unjust or unreasonable as is required by Carter v. Cascade Insurance Company [28] for the award of attorney fees. Considering the overall strength of the factual and legal bases of the surety's rejection of the claim and the litigatory posture of the surety as the controlling party to this action, we believe that its rejection of the claim was not preponderately reasonable, though it was based upon some tenable grounds. Therefore, the award of attorney fees was properly made.

The judgment of the district court is affirmed. Costs to respondent.

McFADDEN, C. J., DONALDSON and SPEAR, JJ., and SCOGGIN, District Judge, concur.

28. 92 Idaho 136, 438 P.2d 566 (1968).