786 P.2d 567

**TWIN FALLS LIVESTOCK COMMISSION COMPANY,**
Plaintiff–Appellant,

v.

**MID–CENTURY INSURANCE COMPANY, Triple H Co., a Colorado corporation dba Kanorado Cattle Company in the State of Idaho, and Cecil Patterson,** Defendants–Respondents.

Nos. 17498, 17579.

Court of Appeals of Idaho.

Nov. 1, 1989.

Petition for Review Denied Feb. 5, 1990.

Lloyd J. Walker, Twin Falls, for plaintiff-appellant.

Stephan, Slavin, Kvanvig & Greenwood, Twin Falls, for defendant-respondent Triple H. Co., dba Kanorado Cattle Co. Richard C. Greenwood argued.

G. Kent Taylor, Twin Falls, for defendant-respondent Mid–Century Ins. Co.

BENGTSON, Judge Pro Tem.

These are consolidated appeals from district court judgments denying claims by Twin Falls Livestock Commission Company (TFLC) against Triple H Co. (Triple H), doing business as Kanorado Cattle Company (Kanorado), and against Mid–Century Insurance Company (Mid–Century). An additional defendant, Cecil Patterson, consented to a judgment against him in the amount of $32,468.62 and is not involved in these appeals. We are asked to decide issues of agency and ratification. For the reasons which follow, we affirm the trial court's determination that neither Triple H nor Mid–Century is liable to TFLC.

### BACKGROUND

Triple H is a Colorado corporation engaged, among other things, in the operation of cattle feedlots. Kanorado is an assumed business name which Triple H uses when purchasing cattle. Because Kanorado is merely an assumed business name, we will use that name and the name "Triple H" interchangeably throughout this opinion.

For some time before this dispute arose, Duane Kloberdanz was a salaried employee of Triple H in charge of the cattle purchase operations of Kanorado. Kloberdanz was individually bonded as a cattle buyer by Mid–Century. In making purchases of cattle, Kanorado dealt with order buyers (those who buy cattle for another on commission) and cattle dealers. Some of its cattle acquisitions were made directly at the time of purchase by order buyers who had direct access to Kanorado's bank account. Other purchases were made from order buyers or dealers who were paid upon receipt and acceptance of the cattle at feedlots operated by Triple H.

In early 1984, Cecil Patterson was recommended to Kloberdanz as a cattle buyer in Idaho. Over the course of several months in early 1984, Kanorado bought approximately 200 head of cattle from Patterson in three or four transactions. In his telephone communications with Patterson, Kloberdanz would tell Patterson what type of cattle Kanorado was seeking and the price Kanorado was willing to pay. Patterson would then look for that type of cattle, call Kloberdanz, and tell Kloberdanz what was available. If Kanorado needed the cattle, it would agree to purchase the cattle from or through Patterson. Patterson would arrange to ship the cattle, and upon receipt, inspection and acceptance in Colorado, Kanorado would wire-transfer to Patterson funds to cover the purchase price.

In April, 1984, Patterson bought some cattle upon being instructed to do so by Kanorado and received payment for the cattle from Kanorado. However, due to an order cancellation, Kanorado had no need for the cattle, and Kloberdanz instructed Patterson to resell the animals. Patterson later resold the cattle and tendered his personal check to Kanorado for the proceeds, but Patterson's check was twice dis-

honored for lack of sufficient funds in Patterson's bank account. During the ensuing months, Kanorado made several attempts to recover the resale proceeds from Patterson, but met with no success. Thus, by August of 1984, Patterson was still indebted to Kanorado in a sum in excess of $32,000.

Subsequent to that resale, but prior to August, 1984, other cattle which Kanorado had agreed to purchase from Patterson were placed in a feedlot in Bliss, Idaho, for custom feeding. Patterson agreed to pay the feedlot bill as part payment of the debt he owed Kanorado arising out of the April, 1984, transaction. At about the time Kanorado picked up the cattle from the feedlot, Kloberdanz advised the operator of the feedlot that Patterson should pay the feedlot bill because he was indebted to Kanorado, but that if he did not do so, Kanorado would pay the bill. The feedlot operator billed Patterson for its services in feeding the cattle, and Patterson tendered his personal check to the feedlot in payment of that bill, but, once again, Patterson's check was not honored because of lack of sufficient funds.

Sometime in the summer of 1984, apparently prior to August 29, 1984, Patterson telephoned Kloberdanz and told him that he (Patterson) had found a "backer" who was going to "back" Patterson's cattle operations. Patterson asked if Kanorado would accept cattle, instead of money, for the debt he owed Kanorado, because his "backer" would permit him to satisfy that debt with cattle, but not with money. Kloberdanz told Patterson he didn't care how the debt was paid—whether by money or cattle—just so long as the debt was paid.

On August 29, 1984, Patterson went to TFLC's sale yard and purchased a number of head of livestock. He told an employee of TFLC that he had an order to buy cattle "for Kanorado." Apparently, Patterson had not previously purchased any cattle on behalf of Kanorado from TFLC in the capacity of an order buyer or cattle dealer. Patterson gave TFLC's employee the name of an employee of a Colorado bank, representing to TFLC's employee that the bank had a business relationship with Kanorado. TFLC's employee then called the employee at the Colorado bank (who, it was subsequently learned, was Patterson's son) and was assured by the bank's employee that Kanorado was "financially secure."

Other than Patterson's representation that he had an order to buy cattle for Kanorado, TFLC had no information—nor did it take any steps to obtain information—verifying that Patterson was an authorized agent of Kanorado or that he had any authority to purchase cattle for the account of Kanorado. TFLC had no knowledge of the relationship between Patterson and Kanorado. TFLC did not attempt to determine whether Patterson was bonded (he was not) or whether Patterson had sufficient funds to pay for the cattle; TFLC did not contact or attempt to contact Kanorado. Neither Kanorado nor Kloberdanz did anything which led TFLC to believe that they were going to be responsible for the payment of the purchase price of the cattle.

When Patterson purchased the cattle on August 29, he wrote a personal check to TFLC in the amount of $32,468.62; the check was post-dated September 26, 1984. The check was dishonored upon presentation to the bank upon which it was drawn, due to lack of sufficient funds. The purchase price for those cattle was never paid. TFLC made no demand upon Kanorado for payment until quite some time (which is unclear from the record) after Patterson's check had been returned to TFLC by the bank and it had become apparent that Patterson—despite his promises to make the check good—would not be able to perform.

Although Kanorado had purchased cattle through "order buyers" in the past, Patterson was not acting in that capacity for Kanorado on August 29, 1984. At no time, on or prior to that date, did Kanorado authorize Patterson to purchase any cattle for it from TFLC. However, on that date, at about 4:00 p.m., Patterson phoned Kloberdanz and told him that he had bought cattle at TFLC and was sending them to Kanorado to "square" the debt he owed Kanorado and that he, Patterson, had paid

for the cattle by a check with the approval of his backer. Patterson also told Kloberdanz that the "titles" to such cattle were made out in Kanorado's name.

Two of the scale tickets issued by TFLC show that 53 head were "purchased by C. Patterson" and "purchased for Konado [sic] Cattle Co." A third scale ticket makes no mention of Kanorado; it merely reflects that Patterson was the purchaser of the balance of the cattle purchased from TFLC. Apparently, the balance of the cattle purchased by Patterson were sold by him and the proceeds were used by Patterson to pay the Bliss, Idaho, feedlot bill which he earlier had told Kanorado he would pay. That feedlot bill was paid on August 30, 1984. The brand inspection certificates issued August 29, 1984, relating to the 53 head, show the "owner or buyer" to be "Cecil Patterson" and "sold or consigned to Konado [sic] Cattle Co."

Forty-nine head of the cattle purchased on August 29 were delivered by Patterson to an employee of Kanorado and transported to Colorado upon instructions from Kanorado. The cattle received by Kanorado had a value of $25,073.19.

The instant action was commenced by TFLC's complaint naming Patterson, Kloberdanz and "Kanorado—Order Buyers, Inc.," as defendants. Later, TFLC's complaint was amended and Mid–Century was joined as a defendant. Trial to the district court, sitting without a jury, commenced March 25, 1987. The issues raised by Mid–Century's cross-claim against codefendants were not addressed in that trial, the court having ordered that such issues would not be tried at that time. When TFLC rested its case in chief, the court granted Kloberdanz's motion for a "directed verdict," but denied a similar motion by Mid–Century.

During the course of the trial, it had become apparent that no such legal entity as "Kanorado—Order Buyers, Inc." existed, and the court ordered the trial continued to a later date. Thereafter, TFLC filed two amended complaints seeking judgment against Kloberdanz, Triple H Co. d/b/a Kanorado Cattle Company, Mid–Century and Patterson for the purchase price of the cattle sold on August 29, 1984. Mid–Century then moved for summary judgment, which the court granted on March 22, 1988.

Trial to the court resumed on April 13, 1988. At the outset, Patterson "stipulated" to the entry of judgment against him in favor of TFLC in the sum of $32,-468.62. This was the amount of the purchase price owed TFLC for the cattle purchased by Patterson on August 29, 1984. Based upon the court's findings of fact and conclusions of law entered following trial, and Patterson's "stipulation" for entry of confessed judgment against him, the court entered judgment in favor of TFLC against Patterson for the sum of $32,468.62, and dismissed TFLC's complaint against Triple H.

Unfortunately, we have not been favored with a reporter's transcript of the portion of the trial commenced on March 24, 1987; it is not part of the record before us. Apparently, the parties entered into a stipulation of facts which was filed when the trial resumed on April 13, 1988, in lieu of a reporter's transcript of the earlier portion of the trial.

With that rather lengthy—but necessary—review of the convoluted procedural record of the proceedings below and the fragmented evidentiary record, we will turn to the discussion of the issues raised on this appeal.

## THE SUMMARY JUDGMENT IN FAVOR OF MID–CENTURY

The appellant, TFLC, first contends that the trial court erred in entering summary judgment in favor of Mid–Century. In his memorandum opinion granting the summary judgment motion, the trial judge noted that, although the evidence at that stage of the proceeding established that Kloberdanz had been bonded by Mid–Century, Kloberdanz had been dismissed as a party defendant during the course of the portion of the trial commenced on March 25, 1987.

Due to the absence of a reporter's transcript of that portion of the trial in the record now before us, we have looked to the minutes of that proceeding for enlight-

enment. The minutes show that the court granted Kloberdanz's motion for a "directed verdict"[1] on March 25, 1987. TFLC has not assigned as error, or raised as an issue on appeal, the trial court's order dismissing Kloberdanz as a party defendant to this action.

An appellate court will not review the actions of a district court which have not been specifically assigned as error, especially where there are no authorities cited or argument contained in the briefs upon the question. Rule 35, I.A.R., requires that issues and arguments thereon be presented in the parties' briefs. *State v. Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983); *Bolen v. Baker,* 69 Idaho 93, 99, 203 P.2d 376, 379 (1949); *e.g., State v. Dennard,* 102 Idaho 824, 825 n. 2, 642 P.2d 61, 62 n. 2 (1982). Thus, the issue of the propriety of the entry of the order dismissing Kloberdanz is not before us and will not be reviewed.

■ The secondary liability of a surety derives from the liability of its principal; thus, the discharge of the principal discharges the surety. *Epperson v. Texas–Owyhee Mining & Development Company,* 63 Idaho 251, 118 P.2d 745 (1941). Mid–Century thus would be liable under its bond only if Kloberdanz were held liable to TFLC. *See United States Fidelity and Guaranty Company v. Clover Creek Cattle Company,* 92 Idaho 889, 452 P.2d 993 (1969). The trial court obviously concluded that the dismissal of Kloberdanz was tantamount to a discharge and that therefore, as a matter of traditional suretyship law, Mid–Century could not be held liable as Kloberdanz's surety.

On appeal, TFLC argues that the court in *Clover Creek, supra,* held that in determining a surety's liability under a bond mandated by the Federal Packers and Stockyards Act, 7 U.S.C.A. §§ 181 *et seq.,* the court must be guided by federal law and regulations rather than state law and traditional principles of agency and suretyship. Although such a proposition was discussed in *Clover Creek,* TFLC's reliance on that case is misplaced. In that case, the role played in the cattle transaction by the dealer bonded under the federal law was the role which Patterson, not Kloberdanz, played in the case at bar. *Clover Creek* is therefore inapposite to the instant case. In the transaction involving TFLC and Patterson, Kloberdanz was not acting either as a "market agency" or "dealer" within the purview of the Packers and Stockyards Act; rather he was merely acting as an employee of Kanorado, as found by the district court.

Furthermore, the Court in *Clover Creek* predicated the surety's liability upon specific language contained in a bond furnished to a registered livestock dealer who was required to post a bond "guaranteeing ... pay[ment], when due, to the person or persons entitled thereto the purchase price for all livestock purchased by [him]." 92 Idaho at 894, 452 P.2d at 998. The Court held that such language "constitute[d] an *independent* promise by him to guarantee payment to the extent of his bond for all cattle purchased by him for himself or for disclosed or undisclosed principals." 92 Idaho at 897, 452 P.2d at 1001 (emphasis added). In the present case we are not aware of the language of the bond that Mid–Century wrote covering Kloberdanz; such bond was not offered in evidence and thus is not a part of the record before us. We cannot, nor could the trial court, predicate liability on language contained in the bond when there is no evidence of such language.

■ We therefore conclude that because Kloberdanz was held not liable to TFLC, his surety, Mid–Century, was relieved of liability—if any there was—to TFLC. We hold that the district court did not err in granting summary judgment in favor of Mid–Century, there being no genuine issue of material fact remaining for resolution at trial.

### THE JUDGMENT IN FAVOR OF TRIPLE H (KANORADO)

#### (a) Agency Issues

TFLC's position appears to be that Kanorado was actually the buyer of the cattle

---

1. Because this action was tried to the court without a jury, such a motion is more properly designated as a motion for dismissal under Rule 41(b), I.R.C.P., on the ground that TFLC, during its case in chief, had failed to show that it was entitled to any relief against Kloberdanz.

purchased by Patterson on August 29, 1984. However, it is clear from the evidence that Kanorado did not order or otherwise direct Patterson to purchase those cattle. Kanorado had no knowledge of that transaction until Patterson had completed the purchase. Patterson then offered to have a portion of the cattle which he purchased placed in Kanorado's name in satisfaction of the debt he owed the latter. Kanorado, plainly and simply, did nothing other than accept Patterson's offer as a means of clearing the debt owed to it by Patterson.

Triple H (Kanorado) could be considered the buyer, and thus liable to TFLC for payment of the purchase price, only if Patterson was acting as an agent of Triple H at the time of such purchase. In *Gissel v. State*, 111 Idaho 725, 728–29, 727 P.2d 1153, 1156–57 (1986) the Idaho Supreme Court stated:

> Agency can be established in three ways. First, real authority—an expression by the principal, either written or oral, granting authority to the agent to act, *Clark v. Gneiting*, 95 Idaho 10, 501 P.2d 278 (1972); *Thornton v. Budge*, 74 Idaho 103, 257 P.2d 238 (1953); *Gorton v. Doty*, 57 Idaho 792, 69 P.2d 136 (1937). Second, implied authority—the principal acts in such a manner which leads the agent to believe that he has authority to act for the principal. *Adkison Corp. v. American Bldg. Co.*, 107 Idaho 406, 690 P.2d 341 (1984); *State v. DeBaca*, 82 N.M. 727, 487 P.2d 155 (1971). Third, apparent authority—acts by the principal involving third parties who are conversant with the business practices of the principal, whereby a reasonable person would be lead [sic] to believe that the agent has authority to act for the principal. *Clements v. Jungert*, 90 Idaho 143, 408 P.2d 810 (1965); *Commercial Insurance Co. v. Hartwell Excavating Co.*, 89 Idaho 531, 407 P.2d 312 (1965); *Anderson v. Smith Frozen Foods of Idaho, Inc.*, 83 Idaho 494, 365 P.2d 965 (1961).

The only evidence in the record on appeal—as to the existence or nonexistence of real authority, express or implied—is the testimony of Kloberdanz, who denied that Patterson was asked to buy the cattle in question on behalf of Kanorado and denied that Kanorado had any prior knowledge of the sale. Kloberdanz testified that Patterson told him that he (Patterson) had already purchased the cattle and that Kanorado could have them in satisfaction of the preexisting debt.

■ The evidence in this case, and, in particular, the stipulation of facts filed on April 13, 1988, clearly establishes that in all of Patterson's dealings with Kanorado prior to August 29, 1984, he was only authorized to act on behalf of Kanorado when Kanorado would advise him of the type of cattle it wished to purchase and the price it was willing to pay. Patterson would look for the specified type of cattle and advise Kanorado what cattle were available whereupon Kanorado, if it then needed such cattle, would agree to purchase the cattle "from or through" Patterson. That pattern of dealing, or course of dealing, between Patterson and Kanorado was not followed on August 29, 1984. We thus agree with the trial judge that, in purchasing the cattle from TFLC, Patterson did not have express authority to obligate Triple H to pay the purchase price.

Similarly, there is no evidence that Patterson had implied authority to purchase the cattle as an agent of Triple H, thus obligating Triple H to pay the purchase price. Under the authority of *Adkison Corp. v. American Bldg. Co.*, cited in *Gissel v. State*, quoted *supra*, the question is whether Triple H acted in a manner leading Patterson reasonably to believe that he had authority to act for Triple H in a purchase of cattle from TFLC. Patterson testified to no such actions or belief. On the contrary, the evidence is clear that Patterson knew he was to purchase the cattle with his own funds—or moneys furnished by his purported new "backer"—and cause the cattle to be shipped to Triple H's cattle-buying arm, Kanorado, in satisfaction of the debt owed by him. The record points to the ineluctable conclusion that Triple H did nothing to generate a reasonable belief

by Patterson that he was authorized to enter into a transaction obligating Triple H to pay TFLC for the cattle purchased by Patterson on August 29, 1984. Therefore, we join the district court in determining that no implied agency existed.

■ Finally, we must look to the record to determine whether Patterson had apparent authority to act as Triple H's agent in purchasing cattle from TFLC. We find no evidence of words or acts by Triple H which would reasonably lead TFLC to believe that Patterson had authority, as an agent of Triple H, to obligate the latter for payment of the purchase price.

The question of apparent authority in this case hinges upon the existence of acts or representations by Triple H to TFLC, such as would lead a reasonable person to believe that Patterson was acting as an agent of Triple H. TFLC cannot merely rely on statements made by Patterson which may have indicated that he was acting as the agent of Triple H, in order to establish Patterson's authority. *Hieb v. Minnesota Farmers Union*, 105 Idaho 694, 672 P.2d 572 (Ct.App.1983) (petition for review denied); *Clark v. Gneiting*, 95 Idaho 10, 501 P.2d 278 (1972); *Brunette v. Idaho Veneer Co.*, 86 Idaho 193, 384 P.2d 233 (1963).

Carolyn Dohse, an employee of Twin Falls Livestock, testified she thought Patterson was a representative of Kanorado only because he told her that he was and not because of anything Kanorado told her; that the information in the brand inspection documents came from Patterson; and that she did not attempt to contact Kanorado to verify Patterson's authority. Furthermore, TFLC has acknowledged in its reply brief that Patterson had no apparent authority.

*Gissel v. State, supra*, discusses the burden of proof where the existence of an agency relationship is in question:

> The party alleging the existence of an agency relationship carries the burden of proof. *Transamerica Leasing Corp. v. Van's Realty Co.*, 91 Idaho 510, 427 P.2d 284 (1967); *Hayward v. Yost*, 72 Idaho 415, 242 P.2d 971 (1952). "Where the existence of an agency relationship is disputed, it is a question for the trier of fact to resolve from the evidence." *Clark v. Gneiting*, 95 Idaho 10, 501 P.2d 278 (1972).

111 Idaho at 729, 727 P.2d at 1156. Here, the trial court's findings of fact, forming the predicate for its conclusion of law that Patterson was not acting as an agent of Kanorado, are supported by substantial, competent evidence. Clear error will not be deemed to exist in a case tried to the court if the findings are supported by substantial and competent, though conflicting, evidence. *Rasmussen v. Martin*, 104 Idaho 401, 404, 659 P.2d 155, 158 (Ct.App. 1983); Rule 52(a), I.R.C.P. We find no error in this case.

### (b) Ratification Issue

Although it appears TFLC contends that Kanorado, by accepting the cattle, ratified Patterson's "act", and thus became liable for payment of the purchase price, its position on the ratification issue is difficult to fathom. On the one hand, in the statement of issues on appeal set out in its opening appellate brief, TFLC implies that the trial court erred in finding and concluding that Kanorado "did not ratify the unauthorized act of its agent, Cecil Patterson." TFLC goes on in its brief to cite Idaho cases which it contends support the legal proposition that "when the principal directly accepts the benefit of an unauthorized act of its agent, (the principal) ratifie[s] the act." Furthermore, in closing argument before the trial court, TFLC's counsel urged that "ratification is clearly present" in this case. On the other hand, TFLC, in the same brief, flatly states "[T]he entire discussion of ratification is really irrelevant.... There was no ratification ever involved." (p. 26, appellant's brief).

■ It is beyond cavil in the law of agency that a principal may be deemed to have ratified the unauthorized act of his agent if, at the time of such ratification, he has knowledge of all the material facts connected with the transaction; that such ratification may be either by words or by conduct indicating an intention on the part

of the principal to adopt the act as his own; and that such intention may be implied from an acceptance of the benefits of the unauthorized act. *T.W. & L.O. Naylor Co. v. Bowman*, 39 Idaho 764, 768–769, 230 P. 347, 348 (1924).

■ To the extent that ratification is a viable issue on this appeal, we uphold the trial court's conclusion that Kanorado did not "ratify Patterson's act by accepting the cattle." We do so for three discrete reasons.

First, it appears clear that the stated proposition of law is predicated upon the assumption that an agency relationship exists ("... a principal may ratify the unauthorized action of his agent...."). In the instant case, the trial court correctly concluded that Patterson was not an agent of Triple H at the time he purchased the cattle from TFLC.

Second, the stated proposition of law is applicable only "if, at the time of such ratification (the purported principal) has knowledge of all the material facts connected with the transaction." As we have noted throughout this opinion, the record fails to show that Triple H had knowledge of all the material facts connected with the August 29, 1984, transaction. All Triple H knew concerning that transaction is what Patterson told Kloberdanz by telephone the afternoon of August 29—that he had purchased and paid for cattle which would be delivered to Kanorado in satisfaction of the debt owed by him. At the time Kanorado accepted such cattle, it had absolutely no knowledge of what Patterson may have said to TFLC regarding the purchase of the cattle. It was not until well after Kanorado accepted the cattle from Patterson and well after TFLC realized that Patterson's check would not be paid by the bank, that Kanorado was apprised of TFLC's contention that Triple H was obligated to pay the purchase price. Thus, even if Patterson had been acting as agent for Triple H, the latter's acceptance of the cattle could not be deemed a ratification of Patterson's unauthorized act, because Triple H did not have knowledge of all the material facts

connected with the transaction between Patterson and TFLC.

Third, the facts clearly establish that Kanorado accepted the cattle based upon its agreement with Patterson that the delivery of the cattle would extinguish the debt owed Triple H by Patterson. Even if we were to assume that Patterson was the agent of Triple H, the latter had an independent right to payment of the debt owed by Patterson. Consequently, it cannot be said that Triple H acted inconsistently by retaining the cattle while repudiating an unauthorized act of its purported agent, Patterson. *Carpenter v. Payette Valley Cooperative, Inc.*, 99 Idaho 143, 578 P.2d 1074 (1978). *See also Linn v. Alameda Mining & Milling Co.*, 17 Idaho 45, 104 P. 668 (1909).

## THE UNJUST ENRICHMENT ISSUE

Upon this appeal TFLC asserts that the trial court erred in not entering judgment in its favor upon the grounds that Triple H would be unjustly enriched if it were permitted to take the cattle without payment therefor. The sole argument presented in TFLC's appellate brief is that "... [r]egardless of the agency factor, a transaction, such as this one, cannot stand in equity."

However, in its second amended complaint, TFLC alleged that Patterson was the agent of Triple H, predicating its claim against Triple H solely upon an agency theory. TFLC did not assert any claim for relief based upon an unjust enrichment theory. The only allusion to the unjust enrichment theory in the record before us is a very brief comment made by TFLC's attorney during closing argument before the trial court to the effect that Kanorado "should have rejected the sale" under an unjust enrichment theory. That argument was objected to by Triple H upon the grounds that such relief was not pled.

The issue of unjust enrichment was not tried, either expressly or by implication. Because no claim on the theory of unjust enrichment was pleaded or proved in the district court, we will not address it here. *Johnson Equipment, Inc. v. Nielson*, 108

184

Idaho 867, 702 P.2d 905 (Ct.App.1985); *see, e.g., Hoppe v. McDonald,* 103 Idaho 33, 644 P.2d 355 (1982).

### THE ATTORNEY FEE ISSUE

■ Both Mid–Century and Triple H have requested an award of costs, including attorney fees on appeal. Because this was a suit based upon an alleged contract for the sale of goods (TFLC's claim against Triple H), and one involving an alleged guaranty (TFLC's claim against Mid–Century), Triple H and Mid–Century are both entitled to awards of attorney fees as prevailing parties, pursuant to I.C. § 12–120,[2] even though no liability under the contract or guaranty was established. *See, e.g., Konic International Corporation v. Spokane Computer Services, Inc.,* 109 Idaho 527, 708 P.2d 932 (Ct.App.1985); *see also Boise Truck & Equipment, Inc. v. Hafer Logging, Inc.,* 107 Idaho 824, 693 P.2d 470 (Ct.App.1984).

Accordingly, the judgments of the district court in favor of Mid–Century and Triple H are affirmed. Costs and attorney fees to each respondent.

WALTERS, C.J., and BURNETT, J., concur.

2. At times pertinent to this suit, which was commenced in 1984, I.C. § 12–120(2) provided as follows:

In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.