(No. 4657.   May 28, 1928.)

NOLA M. SCRIVNER and HERMAN H. SCRIVNER, Respondents, v. BOISE PAYETTE LUMBER COMPANY, Appellant, and PATRICK DOWNS, Defendant.

[268 Pac. 19.]

Alfred A. Fraser and P. B. Carter, for Appellant.

J. R. Smead and L. W. Tennyson, for Respondents.

338

340

TAYLOR, J.—This action was brought against the Boise Payette Lumber Company and Patrick Downs to recover damages for the death of Herman H. Scrivner, the husband of Nola M. Scrivner and father of Herman H. Scrivner, a minor. This is an appeal by the defendant company from a judgment against it.

The defendant company was engaged in operating a lumber-mill, and owned the town site of Barber with, situated thereon in addition to the mill and other buildings, numerous dwellings and a community hall with recreation room and dance-hall therein. The defendant Downs had been employed by the company for some nine years as a watchman, and had performed duties as such and in their nature policing the premises, and in doing so visited all parts of the premises. It may be assumed that he was knowingly permitted to assume and act in the role of policing the premises against disturbance of the peace, although no authority is shown for his designation or appointment with such police power. He was supplied with an automatic pistol, which he cleaned, oiled, cared for and carried in his pocket. The evidence tends to show that two or three days before the fatality, Downs had cleaned and loaded the pistol, and that he may have cocked it and not have put the safety catch in the safe position. While he purchased a ticket entitling him to attend a dance being given in the dance-hall by the box factory employees of defendant, the evidence would support the jury's special finding that he was present as a watchman. Upon entering the passageway leading to the dance-hall, he met the deceased, Scrivner, who was a personal friend of some long time. The evidence of what occurred at the immediate time is wholly

that of the defendant Downs, called as a witness for the plaintiff. He testified:

"I was standing there and Herman said, 'Hello, Pat,' and I says, 'Hello, Herman.' I had the billy in my pocket, and he says to me, 'I would like to make you eat that stick,' and then he kind of looked at me and laughed and says, 'I could make you eat that stick,' and put his hand on it like that way (indicating) and I put my hand in my pocket like that (indicating) and took out the gun and I says, 'Herman, while I am eating that stick you can be eating on that.' Then I heard the report of a gun, and I looked at the gun and the safety catch was off, and I says, 'It is an accident, accident.' "

"I never had any trouble with Scrivner prior to that night. Scrivner and I was always the best of friends. He was my second door neighbor. I never had the least trouble with him. He was a nice, good fellow. He was not making a bit of disturbance there that night. When it happened, I was just standing there watching them dance, was just about to turn around and walk out and go up to the store when it happened. He said, 'I would like to make you eat that stick.' I took it to be jokingly, and I was joking. When I felt for my gun I did not intend to shoot Scrivner. Oh, God! No, I didn't intend to do anything of the kind. I should say not. I wouldn't have shot him for anything in the world."

At the close of plaintiffs' evidence the defendant offered no evidence and moved for a nonsuit upon the ground that the evidence failed to prove or tend to prove that at the time of the shooting Downs was engaged in any act which was expressly or by necessary implication within the line of his duty to the defendant under his employment, but that the evidence, without contradiction, proved the contrary, that he was not so engaged.

Appellant specifies as error: (1) The denial of this motion; (2) the insufficiency of the evidence, for the same reasons, to support the verdict or the findings of the jury

on special interrogatories; (3) the refusal of three re-
quested instructions.

Appellant contends that the evidence conclusively es-
tablishes that both Scrivner and Downs were joking, were
engaged in ''horse-play'' or ''skylarking,'' and that Downs
in so doing stepped entirely out of the scope of his em-
ployment, and for this reason the company is not liable.

■■ Upon a motion for nonsuit, all reasonable infer-
ences must be indulged in favor of the plaintiff as to any
facts which the evidence tends to establish. If there is a
conflict in the evidence, or more than one inference may
reasonably be drawn therefrom, then the question is for
the jury. If, however, only one conclusion can be drawn,
it is a matter for the court. (6 Labatt on Master and
Servant, 2d ed., sec. 2275.)

Respondents present three theories in support of the
judgment: (1) That the acts of Downs were within the
scope of his employment in that the jury has found, in
answer to special interrogatories, that ''at the time of the
discharge of the pistol'' he was engaged in an act which
was ''expressly or by necessary implication within the line
of his duty . . . . under his employment,'' in that ''he was
acting as watchman and attending dance in interest of
order and line with his duty''; (2) that the original negli-
gence of Downs in having the pistol in his pocket in a
loaded, cocked and unsafe condition was the negligence of
the defendant company, and was the proximate cause of
the injury, regardless of whether the defendant is charge-
able with his later acts of negligence in drawing and point-
ing it and causing it to be discharged; (3) that the pistol
being an inherently dangerous instrumentality entrusted to
a servant, the company is liable for its negligent handling
in any event, as a failure to exercise the high degree of
care necessary under such circumstances. An extended
discussion of these points, as bearing upon the error alleged
in refusal of requested instructions, becomes necessary.

Upon their first theory, counsel for respondents admit
and stress the fact that the shooting was purely uninten-

tional, and argue that as it was unintentional, it was not wilful, and did not remove the act from that of a servant to a wilful act of his as an individual. The trouble with this reasoning is that it begins only with the shooting or discharge of the gun, the last of and only one of the acts in a series, and leaves out of consideration whether the drawing or pointing of the pistol was intentionally done as a joke. The inquiry must begin earlier. Unless the master is chargeable with the drawing and pointing of the pistol, the unintentional discharge thereof is not a starting point or controlling as to the wilfulness of the servant's act of wrongdoing, and is not the starting point of his possible stepping out of the character of a servant.

When the acts of a servant are not within the scope of his employment, it does not matter whether the injury was intentional or not. It is the stepping out of the character of a servant, and doing some act not within the scope of his employment, which renders it the independent act of the servant, not depending upon whether the resulting injury was intended or unintentional. The fact that Downs was engaged in his general line of duty in going about the premises as a watchman, and even as such carrying the pistol, does not of itself serve to render the appellant liable for his act in drawing and pointing it at deceased, if that were done as a joke. It is not enough that the wrongful act was in some way associated with the servant's authorized functions, or that he committed it at a time when he was occupied with the discharge of those functions. If it was not done as a means or for the purpose of performing his work, or in the scope of his employment, the master is not liable. (6 Labatt on Master and Servant, 2d ed., sec. 2274, p. 6853; *Bowler v. O'Connell,* 162 Mass. 319, 44 Am. St. 359, 38 N. E. 498, 27 L. R. A. 173; *Rounds v. Delaware, L. & W. R. Co.,* 64 N. Y. 129, 21 Am. Rep. 597.)

"The test of the employer's liability is not in the fact that the negligent act of the servant was during the existence of his employment; nor is the test that his act was

done during the time he was doing some act for his employer. But the test is: Was the act causing the injury done in the prosecution of the master's business?" (*Jackson v. Chicago, R. I. & P. Ry. Co.* (C. C. A.), 178 Fed. 432 (435).)

Authorities generally hold that a master is not responsible if it appears that the act which occasioned the injury was done by the servant solely with a view to some purely personal object, such as an act "done with a view to the personal enjoyment of the servant himself," or as a joke. (6 Labatt on Master and Servant, 2d ed., p. 6910, sec. 2288, p. 7196, sec. 2379.)

It is urged that the negligence of Downs in carrying the gun loaded and cocked and with the safety appliance off, rendering it unsafe, was committed in the scope of his employment, and constituted negligence of the company and the proximate cause of the injury, under principles such as announced in *Feeney v. Standard Oil Co.*, 58 Cal. App. 587, 209 Pac. 85; and that thus the company is liable regardless of whether it is to be charged with the later acts of Downs in drawing and pointing the pistol and causing it to be discharged. If these later acts of Downs were within the scope of his employment, and not done as a joke, this contention is of little importance; but if they were done as a joke, or were otherwise not within the scope of his employment and not chargeable to the defendant as its negligence, then the point made is important.

In the Feeney case, McDonald, a servant, had spilled some gasoline in a delivery thereof made by him to plaintiff, and his failure to mop it up, and thus his leaving it exposed to probable ignition and explosion, was held to be negligence of the defendant master. Some fifteen minutes later, while waiting for receipts for this delivery, McDonald carelessly threw a lighted match in the spilled gasoline, which caused the explosion, fire and damage. The court held that the subsequent independent negligence of McDonald in throwing the lighted match, was not negligence of the defendant, but that its negligence in failing to mop up

or in leaving this dangerous agency exposed, was not displaced as a proximate cause of the damage by such subsequent independent negligence of McDonald. The court held, upon principles quoted from *Lynch v. Nurdin*, 12 Q. B. (Ad. & E., N. S.) 29, and like authorities, that the defendant must have known that it was "extremely probable" that some other person would unjustifiably set this dangerous element in motion to the injury of the plaintiff; that this would be apparent to a man of ordinary capacity and prudence; and that "the danger to be apprehended was well within the range of reasonable foresight."

Other decisions of the California courts, such as *Merrill v. Los Angeles Gas & Electric Co.*, 158 Cal. 499, 111 Pac. 534, 31 L. R. A., N. S., 559, and *Sawyer v. Hooper*, 79 Cal. App. 395, 249 Pac. 530, furnish further examples of the principles involved and which controlled the Feeney case. The court in *Sawyer v. Hooper, supra,* however, recognized that the principles there invoked were the exception to the general rule, that if no direct negligent act of a defendant was the cause of the injury, but that such injury arose from the negligent act of a third person, no liability would attach to the defendant, and stated as such exception, that—

" . . . . Where it appears that one has committed a negligent act, which is continuing in its nature, and from which it is or should be anticipated that in the ordinary or natural course of human conduct, a succeeding act of negligence directly connected with the first negligent act, is likely to be committed by any person and which will result in injury, the proximate cause of said injury will include the first negligent act."

The principles to be drawn from the authorities are that in order that a subsequent independent act of negligence shall not displace a former one as the proximate cause, or to constitute the first of two acts of negligence the proximate cause of an injury, it is necessary that the succeeding act of negligence should be so connected with the first in time and nature as to make it plain that the damage was the natural and probable consequence of the

original wrongful act or omission, and that to establish this the original negligence must have been such that it must have been known to or anticipated by the original wrongdoer that in the natural course of human conduct, a succeeding act of negligence was at least likely to be committed, or, as said in *Lynch v. Nurdin, supra,* it was extremely probable that some other person would unjustifiably set in motion the dangerous instrumentality or negligent condition created by the original wrongdoer, and thus cause an injury.

██ Unless it can be said that it should have been apparent to a man of ordinary capacity and prudence, and the defendant company must have known and anticipated that it was likely, and well within the range of reasonable foresight, that Downs, in the ordinary and natural course of events, would, upon an occasion in nowise calling for it, and not as a part of the performance of any duty, or in the scope of his employment, needlessly, wilfully, carelessly, and as a joke, draw and point this loaded pistol at someone, and "cause[d] it to be discharged," the original negligence cannot be said to be the proximate cause of the injury. No two reasonable minds could differ upon the fact that this was not "extremely probable" or "likely" or even to be anticipated "within the range of reasonable foresight," and the supposed unsafe condition of the pistol in his pocket, if it existed, cannot be said, under such circumstances, to have been the proximate cause of the injury.

Upon plaintiffs' third contention, we agree with counsel's statement, as to inherently dangerous agencies, that "the obligation to guard a dangerous thing attaches to and accompanies that thing so long as it remains in the employer's service," and "the duty to guard it is a continuous one which accompanies such agency or implement so long as it is retained for use in one's business." There is, however, a lack of accord in the authorities as to the extent of the responsibility of the master, where the servant to whom it is entrusted with the duty to guard it, steps aside from the scope of his employment and uses the instrument for

a purpose of his own, either of business or pleasure. *Pittsburgh, C. & St. L. R. Co. v. Shields,* 47 Ohio St. 387, 21 Am. St. 840, 24 N. E. 658, 8 L. R. A. 464, and *Euting v. Chicago & N. W. R. Co.,* 116 Wis. 13, 96 Am. St. 936, 92 N. W. 358, 60 L. R. A. 158, are two outstanding authorities cited as holding that a servant entrusted with the care thereof cannot step aside from the scope of his employment to perpetrate a joke with such instrumentality without rendering the master liable, because by so doing he violates the absolute duty to guard such instrumentality.

Many other courts have, for various reasons, not followed the rule in the Shields case. Some have construed its holding to be one of absolute liability of the master as an insurer, and flatly refused to follow such a rule. (*Goupiel v. Grand Trunk Ry. Co.,* 96 Vt. 191, 30 A. L. R. 690, 118 Atl. 586.) Others have adhered to the doctrine of *respondeat superior,* although in so doing they have been said to lose sight of the nondelegable duty of the master. Others which have imposed a liability have been said to have strained themselves to apply the doctrine of *respondeat superior,* when the result could have been readily arrived at under the rule as to dangerous agencies. (6 Labatt on Master and Servant, 2d ed., sec. 2503.)

The negligence in the Shields case as to the torpedoes was therein said to be in "negligently leaving them on the track"; and the reasoning which appeals to us is that of *Galveston, Harrisburg & S. A. Ry. Co. v. Currie,* 100 Tex. 136, 96 S. W. 1073, 10 L. R. A., N. S., 367, which does not do violence to either rule. The distinction is there properly made that the Shields case was one wherein the servant neglected a duty to guard a dangerous instrumentality, and the injury was "the consequence of such neglect," wherein it is said that a servant, "still an independent and responsible being, with capacity, which the master cannot efface or control, to engage in projects of his own," who, "in pursuing his own business or pleasure, neglects, also, to perform some duty which rests upon the master, may make the master responsible if injury fall upon another as

the consequence of that neglect," but that the master is not liable if the injury results "not from the mere neglect, but from the positive personal wrong, of the servant."

That decision very properly points out that in the Shields case the injury "was not inflicted by the servant in the attempt to play a joke, but resulted from his negligence in leaving the cartridge where the children found it; in other words, from his failure to safely keep it"; and that if, in the Shields case, the injury had been "inflicted by the servant in the attempt to play a joke," it would have been parallel with the one under consideration, wherein the company was held not liable because the injury resulted "not from the mere neglect, but from the positive personal wrong, of the servant."

If Downs was joking, which is a question for the jury, we have a case parallel with the Currie case, and defendant is not liable. In the language of that decision,—

"It may be just to charge a master with liability for the failure of a servant to properly guard a dangerous agency, with the duty of guarding which the servant has been intrusted, when, in consequence of such failure, injury proximately results to another; but to say that the master, assuming that there has been no negligence in selecting and retaining the servant, is liable for the independent act of that servant in diverting the thing from the master's business, and using it in his own, or as an instrument of malice or amusement, is to lose sight of the principle underlying the whole subject."

The weakness of appellant's position is that it must assume the absolute verity, as an established fact, of the evidence of Downs that he was joking, and that no two reasonable minds could differ upon that question. While the evidence would support a verdict to that effect, such question would ordinarily be one for the jury. (*Robards v. P. Bannon Sewer Pipe Co.,* 130 Ky. 380, 132 Am. St. 394, 113 S. W. 429, 18 L. R. A., N. S., 923; *Baltimore Consolidated R. Co. v. Pierce,* 89 Md. 495, 43 Atl. 940, 45 L. R. A. 527.)

The evidence was sufficient to establish that Downs was

authorized to carry the pistol, and, so far as carrying it, was within the scope of and engaged in his employment as a watchman at the time. If so, it must be contemplated that upon occasions calling for its use, he had discretion to draw and point it at someone in the scope of his employment. If not, why carry it at all? If, as appears, he must be the one to determine the propriety of the occasion and of such action, a mistake in his judgment of the existence of an occasion calling for the exercise of such discretion or action would not excuse the company (*Robards v. P. Bannon Sewer Pipe Co., supra;* 6 Labatt on Master and Servant, 2d ed., sec. 2277, pp. 6868–6871, sec. 2368, p. 7151), unless it could be said that the occasion was so plainly one beyond the scope of his employment and discretion with which to deal, or the act so plainly in excess of any duty or employment or discretion, that it could be said, as a matter of law, that he stepped beyond the scope of his duty and employment. (6 Labatt on Master and Servant, 2d ed., sec. 2369.)

The jury may have believed that Downs' acts were not done as a joke or for his own purpose; in other words, have concluded that he was acting upon his understanding of the exigencies of the occasion, and using his discretion, in his belief and intent to perform the duties of his position within the scope of his employment, "in interest of order and line with his duty," and have disbelieved his statement that he was joking. (*Baltimore Consolidated R. Co. v. Pierce, supra.*)

The very fact that he testified that he had no intention to shoot Scrivner, might, in the minds of some, support a belief that, short of actual shooting, he was exercising his discretion, and determined that the occasion was one calling for his display of authority and power to quell an incipient disturbance, and that the discharge of the pistol was due to his negligence. Downs was not by any means a disinterested witness, or so wholly unsusceptible to bias as to demand that his statements be given absolute verity

as conclusive. (*Adamson v. Mattson*, 32 Ida. 493, 185 Pac. 553; *Marshall v. Taylor*, 168 Mo. App. 240, 153 S. W. 527.)

We cannot say as a matter of law that the evidence conclusively shows, and that no other inference could be drawn from it than that both Scrivner and Downs were joking, and that Downs was joking in all of his acts in withdrawing the pistol from his pocket and pointing it at Scrivner, and thus acting outside the scope of his employment. The court did not err in denying the motion for nonsuit, and the evidence cannot be said to be insufficient to support the verdict.

Appellant complains of the refusal of three instructions. Nos. 3 and 4, requested, would have unduly restricted the jury to the necessity of a finding that the act of Downs in "shooting" Scrivner "was expressly or by necessary implication within the line of his duty under his employment," and would have required them to render a verdict for the defendant, "unless said shooting" was "done as a means or for the purpose of performing work for or advancing any interest of" the company. These instructions unnecessarily narrowed the issue, in view of the fact that if Downs was in the performance of his duty, or the scope of his employment, when he drew and pointed the pistol, or drew and pointed it "as a means or for the purpose of performing work for or advancing any interest of" the company, the actual shooting, the discharge of the pistol, might have been unintentional, but due to negligent handling of the pistol, and the shooting itself thus the result of negligence going before the actual discharge, and the actual discharge of the pistol, the "shooting," may not thus have been done for the purpose of performing work for, or advancing any interest of, the company, and yet the company be liable for the negligence in drawing and pointing it, or causing it to be discharged.

While the instructions given are not assigned as error, a *résumé* of the general tenor thereof will serve as a measure of the theory upon which the case was submitted, of the purpose of the special interrogatories, and the possible

reasons of the jury for their answers thereto and the general verdict, as bearing upon the error in refusal of requested instruction No. 2. The court instructed, in effect, that a loaded firearm is a dangerous instrumentality, and anyone making use thereof or having the same in his possession must exercise the highest degree of care practicable in the custody and use thereof; that just what act or acts are within the course of the employment of an agent can be determined by no fixed rule; that if the company authorized Downs "to act as watchman or patrolman for it in and about its premises at Barber, Idaho, and to carry or use a loaded firearm while engaged in the course of such employment," and "at the time said revolver or pistol was discharged, said Downs was engaged in some act which was expressly or by necessary implication within the line of his duty or the scope of his authority under his employment," then if while so engaged "he failed to exercise the necessary degree of care as to such weapon while engaged in the course of the master's business, his failure of such care would be negligence both of himself and of the company," and this would be sufficient on which to base a verdict against the company; that negligence was charged in the carrying of the gun in a loaded, cocked and unsafe condition, and in negligently drawing, pointing and discharging it; that it was "only necessary for the plaintiffs to establish by a preponderance of the evidence that the Boise Payette Lumber Company, either by itself or by and through its agent and servant, Patrick Downs, was negligent in some, or at least one, of the particulars set forth in the complaint."

The court submitted two special interrogatories, which, with the jury's answers, were as follows:

Question: "At the time of the discharge of the pistol or revolver which caused the death of Herman Scrivner was Patrick Downs engaged in any act which was expressly or by necessary implication within the line of his duty to the Boise Payette Lumber Company under his employment?"

Answer: "Yes."

Question: "If you answer the above question in the affirmative you will state what was the act which was expressly or by implication within the line of his duty to said Boise Payette Lumber Company which he was engaged in doing at this time."

Answer: "He was acting as watchman and attending dance in interest of order and line with his duty."

■ Appellant's requested instruction No. 2 was as follows:

"You are instructed that the law is, that if the servant steps aside from his master's business for however short a time to do an act not connected with his business, the relation of master and servant is for the time suspended. In this case if you find from the evidence that at the time said Patrick Downs discharged the pistol or revolver which killed Herman Scrivner, he, the said Downs, was not engaged in any business or performing any duty for said Boise Payette Lumber Company, in that event your verdict should be for said defendant."

The substance of this instruction is supported by authority. (*Morier v. St. Paul, M. & M. R. Co.,* 31 Minn. 351, 17 N. W. 952; 6 Labatt on Master and Servant, 2d ed., sec. 2225; 2 Cooley on Torts, 3d ed., p. 1030 et seq.)

Respondents' argument against this assigned error is that "the court gave instructions covering the general subject very thoroughly," and "also gave an instruction which is quite similar," which "stressed precisely the same point which appellant sought to emphasize." The instruction referred to as given was this:

"You are instructed that the fact, if it is a fact, that the pistol or revolver from which the shot was fired which killed said Herman Scrivner was the property of and was furnished by said defendant, Boise Payette Lumber Company, to said Patrick Downs, is not of itself sufficient to create a liability against said Boise Payette Lumber Company unless you further find from the evidence that at the time said revolver or pistol was discharged said Downs was engaged in some act which was expressly or by necessary

implication within the line of his duty or the scope of his authority under his employment.''

This instruction was neither similar nor did it stress or present at all the same point, nor was the point covered by other instructions. From this instruction and the *résumé* heretofore made of others, and from the special interrogatories and answers thereto, it appears plainly that the company's liability was made to rest upon, and in the eyes of the jury needed only a finding that the pistol was furnished by the company; that Downs was engaged in some act (''any act'') within the line of his duty under his employment, and was negligent in the custody of the pistol; and a finding that ''he was acting as watchman and attending dance in interest of order and line with his duty,'' and carried the pistol in his pocket in a negligent or unsafe condition, was sufficient upon which to base a liability of the company, without regard to whether the pulling or pointing or discharging of the pistol were acts ''within the line of his duty or the scope of his authority under his employment,'' or were the proximate cause of the injury, or were acts outside the scope of his duty and employment, or done as a joke. In other words, under the instructions given, it was only necessary to find that Downs was acting as a watchman, and carried the pistol in an unsafe condition in his pocket.

The evil of the refusal of instruction No. 2 was that the nature of the questions presented made the substance of the first sentence thereof vital, and it was nowhere given in form, substance or effect, and the jury were nowhere apprised of the law applicable to the possibility of Downs being in the perpetration of a joke when he drew and pointed the pistol, or if so, of his having thereby stepped aside from his master's business, and thereby the relation of master and servant, for the time being, possibly suspended. Without it, the law applicable to the theory of defendant was not properly presented to the jury. This was error, for which the judgment must be reversed.

The judgment is reversed and the cause remanded for a new trial. Costs to appellant.

T. Bailey Lee, J., and Varian and Ensign, District Judges, concur.

Budge and Givens, JJ., disqualified.

WM. E. LEE, C. J., Dissenting.—I am of the opinion that the judgment should be affirmed.

It is said in 1 Thompson, Neg., sec. 532, that:

" . . . . a master who employs a dangerous agency upon his premises, or in the prosecution of his business, and commits such agency to his servants, thereby commits to them his own obligation of using care in respect to them to the end that third persons be not injured by them; and he is responsible for the negligence of his servants in discharging this obligation, although they may have been guilty of the act of negligence, for the sole purpose of accomplishing some object of their own outside of the scope of their employment."

See, also, 6 Labatt, Master & Servant, 7646; 2 Cooley on Torts, 3d ed., 1033, 1038; 1 Thompson, Neg., sec. 523.

In the Currie case, which the majority accepts as stating the correct rule, the court said:

"The fact that the servant, in pursuing his own business or pleasure, neglects, also, to perform some duty which rests upon the master, may make the master responsible if injury fall upon another as the consequence of that neglect; but that is a very different proposition from that maintained by plaintiff, asserting liability for an injury resulting, not from the mere neglect, but from the personal positive wrong of the servant."

This language is decisive that the master is only exempt from liability for injuries resulting from the entrustment of a dangerous instrumentality to a servant when the servant wilfully commits the act causing the injury. The record is devoid of any evidence that Downs intended to fire the gun and, on the contrary, he testified that the shoot-

ing was "an accident." It appears to me, therefore, that in reaching their conclusion the majority have failed to distinguish between a wilful act and a negligent act, or, in other words, whether the servant has departed from his employment or has neglected a duty in the line of his employment. In the first instance the master is not liable and in the second he is. (*Riordan v. Gas Consumers' Assn.*, 4 Cal. App. 639, 88 Pac. 509; *Euting v. Chicago etc. Co.*, 116 Wis. 13, 96 Am. St. 936, 92 N. W. 358, 60 L. R. A. 158; *Pacific etc. Co. v. Bank of Palo Alto,* 109 Fed. 375, 48 C. C. A. 419, 54 L. R. A. 715.) The shooting of Scrivner, being "an accident," was not the wilful act of Downs; the injury resulted from Downs' failure to use proper care in the handling of a dangerous instrumentality, rather than his personal positive wrong.

The trial court properly refused the instruction the majority holds should have been given. It fails to recognize the liability of the master when the servant (not in the performance of a wilful act of his own) occasions injury to another by neglecting to perform a duty resting upon the master.