672 P.2d 572

**Art HIEB, Plaintiff-Respondent,**

v.

**MINNESOTA FARMERS UNION, Defendant-Appellant,**

and

**Wallace Leander, Defendant.**

**No. 14109.**

Court of Appeals of Idaho.

Nov. 15, 1983.

William Breck Seiniger, Jr., Boise, for defendant-appellant.

William Kent Fletcher, Burley, for plaintiff-respondent.

## ON DENIAL OF PETITION FOR REHEARING

McFADDEN, Judge, Pro Tem.

This action was instituted by Art Hieb, owner of a farm machinery repair and manufacturing shop in Paul, Idaho, seeking the balance due for working on the construction of a hay compactor. Hieb alleged that the Minnesota Farmers Union (hereinafter referred to as the Union) had contracted, through its purported agent, Wallace Leander, for the compactor to be built. Leander defaulted, but the Union answered the complaint, denying that Leander had authority from the Union to contract for the machine. The case was heard before the court, which entered its findings of fact, conclusions of law and judgment in favor of Hieb. The Union appealed from the judgment, but Leander took no appeal. The controlling question before us is one of agency. We reverse the judgment against the Union.

The trial court made detailed findings as to the circumstances surrounding the disputed transaction. Shortages of hay following the drought of 1976–77 in Minnesota prompted the Union (an organization of individual farmers) to institute an emergency hay buying program under the direction of one F.B. Daniel. The Union retained Leander to act on its behalf in purchasing and shipping hay from Idaho to Minnesota. The Union registered in Idaho as a "track buyer" under then I.C. §§ 22–1401 to –1419,[1] listing Leander as its agent. Under his arrangement with the Union, Leander

1. The "track buyer" provisions were repealed, 1982 Idaho Sess.Laws, ch. 94, § 1, pp. 176–77, and were replaced by the "Commodity Dealer Law," now codified at I.C. §§ 69–501 to –525.

was to find and secure available hay in Idaho suitable for feed for dairy cows; to purchase it with funds placed in a special bank account in Burley, Idaho; and to ship the hay to Minnesota. He was to receive $7.50 commission for each ton of usable hay which reached Minnesota.

The record reflects that Leander conceived the idea of further compacting the bales of hay prior to shipment, allowing each truck to carry a greater load, thus increasing Leander's commission per truckload. In January, 1977, Hieb was approached by Leander, who introduced himself as a hay buyer for the Union. Leander inquired about the possibility of Hieb constructing a "hay compactor." A compactor was not a novel idea, but was one not then in current use. They discussed the feasibility of the machine and negotiated its cost, finally arriving at a figure between $4,000 and $5,500. During the discussion, the question of the form of payment arose. Hieb testified as to Leander's view of the solution to the problem of payment as follows:

> "Well, he said if he finds the proper equipment that would suit him, you know, then he would—and I also asked him about who's going to pay for that machine or who's going to have that machine. He said he'll go back to the Minnesota Farmers Union and get everything arranged to go ahead and build it. And I told him it was fine with me.
>
> .    .    .    .    .    .
>
> "Q. Okay. And how long was it until you saw him again?
> "A. I don't remember exactly. A week, two weeks, somewheres in there. Then he returned, and all enthused about it, he said, 'The word is "Go." ' "

As indicated by this testimony, Leander made a trip back to Minnesota, and subsequently returned, supposedly with an "okay," and gave Hieb a $900 cash down payment to enable him to begin work on the compactor. Leander also gave Hieb numerous used parts, which Hieb acknowl-

edged came from Leander's surplus supply business, unconnected with the Union. Hieb commenced working on the machine.

Leander did in fact return to Minnesota to obtain financing for the machine but, according to him, not necessarily to receive the "okay" from the Union. Leander's testimony indicates his different impression of the events that occurred.

> "Well, the only thing I can think of, as we get—before we started this thing, we had the initial design in our mind, and we figured we had something we could build. I told him I had to go back to Minnesota and talk to the Farmers Union about it.
> "And what I was doing, I guess I didn't say specifically, I don't think, that I was going back there to get their approval. But I was going back to get this money that I talked to Mr. Hieb about."

Leander contacted Daniel, who agreed on behalf of the Union to loan Leander money for his hay compactor project. The Union advanced Leander $3,000 against his commissions. An agreement was drawn up and signed by Leander and Daniel which provided:

> "Minnesota Farmers Union Haylift did this date advance the amount of three thousand ($3000) dollars at no interest, to Wallace Leander of Thief River Falls, Minnesota to assist in the construction of a hydraulic hay bale compactor.
> "Mr. Leander agrees to provide the additional capital required. . . .
> "It is agreed that Farmers Union hay needs will be met before any custom use of the machine.
> "The advance is to be repaid to Farmers Union at the rate of $2 for each ton of hay shipped, payment in full being due on or before December 31, 1977. The compactor subject, only to this lein [sic], is property of and will be operated by Wallace Leander."

At the time this contract was entered into, no one from the Union had ever contacted Hieb.[2] In fact, no evidence was presented

---

**2.** Hieb later had contact with someone from the Union. Hieb testified at trial that in 1980, three

years after the contract in question was entered into, he received a telephone call from

to show that anyone at the Union then knew of Hieb's identity. Hieb never received any correspondence or checks from the Union. Hieb was never informed of the written loan agreement or its contents, nor did he inquire into the monetary arrangements between Leander and the Union. There was no evidence that Hieb knew about the special bank account in Burley.

Leander and Hieb worked together in designing the compactor. Actual construction of the machine began in February and continued intermittently through May, 1977. The bill for parts and labor on construction of the machine totaled $7,221.23, less the $900 down payment.

The compactor itself was never actually completed, presumably because Leander disappeared in May, 1977. When Leander disappeared, Hieb ceased working on the compactor. Leander did at one point reappear, and when Hieb inquired of him concerning final payment, Leander gave him the telephone number of the Union. Hieb called the Union and spoke with an unknown person, who denied the Union's liability for the bill.

Hieb filed this action against the Union and Leander, seeking the balance due on the compactor. The trial court in effect found that the Union had led Hieb to believe Leander had the authority to go ahead with the compactor project on behalf of the Union and that Hieb acted reasonably on that belief. However, the trial court did not include in its findings of fact examples of any instances where the Union had contact with Hieb directly. The Union urges five assignments of error on appeal. The major issue is whether the trial court erred in finding that Leander was cloaked with apparent authority to contract for the Union. Because we reverse the trial court on that issue, we find it unnecessary to discuss any of the other assignments urged by the Union.

■ This appeal focuses upon the trial court's application of the law of agency to the facts. There are three separate types of agency, any one of which being established is sufficient to bind a principal to a contract entered into by an agent with a third party. These three are: (1) express authority (a form of what is commonly referred to as actual authority); (2) implied authority (also a form of actual authority); and (3) apparent authority. *Clark v. Gneiting*, 95 Idaho 10, 501 P.2d 278 (1972). The trial court in effect held that, while there was no actual authority, there was apparent authority. We agree with the trial court on the question of actual authority, but disagree with its determination of apparent authority. Under the facts as found by the trial court and after a thorough review of the record, we cannot say as a matter of law that Leander was cloaked with apparent authority. Lacking such authority, Leander, in contracting with Hieb, could not bind the Union.

■ Apparent authority exists where "a principal voluntarily places an agent in such a position that a person of ordinary prudence, conversant with the business usages and the nature of a particular business, is justified in believing that the agent is acting pursuant to existing authority." *Id.* at 12, 501 P.2d at 280. The principal himself must place the agent in the position which gives him the apparent authority.

"The apparent power of an agent is to be determined by the acts of the principal, and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct and statements have created the apparent authority." *Brunette v. Idaho Veneer Co.,* 86 Idaho 193,

one Vattauer, who indicated he was a Union board member and indicated that the Union should pay the debt to Hieb. Other evidence showed that Vattauer, although a member of the state board of the Union, served in this capacity with eighty-two other county representatives. This board met only quarterly and delegated its responsibilities to an executive board elected from its membership. There was no proof that Vattauer, merely because of his position as a member of the board, had any authority to speak for the Union.

198–99, 384 P.2d 233, 236 (1963) (quoting 3 Am.Jur.2d *Agency* § 74, at 476 (1962)).

It is helpful to examine prior Idaho cases where apparent authority was found to exist, to determine what action of the principal will suffice to bind him to a particular contract. In *Bob Rice Ford, Inc. v. Donnelly,* 98 Idaho 313, 563 P.2d 37 (1977), a car salesman had express authority to sell cars, but only when sold upon the principal's lot. The salesman was expressly forbidden to sell cars at any other location. However, the company supplied him· with dealer plates, dealer sales forms and use of the dealer number. He then used these forms to make a sale at his own private residence. The trial court held that the salesman had apparent authority to sell the car. Our Supreme Court upheld the trial court, saying that the dealer had invested apparent authority in the salesman since it supplied the salesman with the dealer's plates and number as well as contract forms. "A person of ordinary prudence relying upon such indicia of authority might well believe that [the salesman] was acting within the intended scope of his authority." *Id.* at 315, 563 P.2d at 39.

Another case dealing with apparent authority is *White v. Doney,* 82 Idaho 217, 351 P.2d 380 (1960). In that case the Whites possessed a small trailer. A man named Easter, whom the Whites recognized as defendant-appellant Doney's "agent," came to their home to contact them about buying a larger trailer. The Whites were then induced to sign a conditional sales agreement bearing the name of Doney's business. When Doney later repossessed the trailer, the Whites sued for conversion. On appeal,· our Supreme Court affirmed the judgment in favor of the buyers and said:

"[W]here an agent has acted within the apparent scope of his authority and the third party dealing with the agent has relied upon the appearance of authority to such party's detriment, in theory the principal becomes estopped to deny · agent's apparent authority to do the particular act or acts in controversy. [Citations omitted.] The authority of the

agent to act for and on behalf of his principal does not have to be established by direct or positive proof, but may be inferred from dealings, circumstances, acts and conduct." *Id.* at 221, 351 P.2d at 382.

*See also Branom v. Smith Frozen Foods of Idaho, Inc.,* 83 Idaho 502, 365 P.2d 958 (1961); *Molstead v. Reliance National Life Ins. Co.,* 83 Idaho 458, 364 P.2d 883 (1961).

In the present case, our attention is invited to the fact that Leander was the Union's agent for the purpose of buying hay. However, an agent with actual authority for one purpose does not thereby become an apparent agent for all other types of transactions. This case differs from *Commercial Insurance Co. v. Hartwell Excavating Co.,* 89 Idaho 531, 407 P.2d 312 (1965) (bonding company agent issuing performance bonds), and from *Molstead v. Reliance National Life Ins. Co., supra* (insurance agent issuing insurance policy). In those cases, the person entering into the contract with the third party was someone, already an agent of the principal, performing his usual day-to-day activity for the business. Here admissions by Hieb at trial and in post trial briefing negated any implied authority arising from the hay buying agency. According to Hieb, Leander had to go to Minnesota to get the approval of the Union. This admission also demonstrates that Leander's status as a hay buyer was not an indicia of apparent authority to contract for a hay compactor.

Nothing present in this case is sufficient to provide a basis for holding that Leander was clothed with apparent authority. Leander had no indicia of authority aside from his authority to purchase and transport hay on behalf of the Union. His authority to write checks on a Union account was never known to Hieb. There is in this record no indication of any activity on the part of the Union which placed Leander in a position such that "a person of ordinary prudence, conversant with the business usages and the nature of a particular business, [would be] justified in believing that the agent is acting pursuant to existing

authority." *Clark v. Gneiting, supra,* 95 Idaho at 12, 501 P.2d at 280.

■ It is a well settled rule in Idaho that a third party cannot rely on the statements of the agent alone to establish apparent authority. *Idaho Title Co. v. American States Ins. Co.,* 96 Idaho 465, 531 P.2d 227 (1975); *Clark v. Gneiting, supra; Killinger v. Iest,* 91 Idaho 571, 428 P.2d 490 (1967); *Brunette v. Idaho Veneer Co., supra.* Our Supreme Court indicated the reasoning behind this rule in *Chamberlain v. Amalgamated Sugar Co.,* 42 Idaho 604, 612, 247 P. 12, 14 (1926):

> "The rule would seem to be that a person dealing with an agent should ascertain the extent of his authority from the principal [citations omitted]; or from some other person who will have a motive to tell the truth in the interests of the principal [citation omitted] and he cannot rely upon the agent's statement or assumption of authority, or upon the mere presumption of authority. [Citation omitted.] If such person makes no inquiry but chooses to rely upon the agent's statement he is chargeable with knowledge of the agent's authority, and his ignorance of its extent will be no excuse to him, and the fault cannot be thrown upon the principal who never authorized the act or contract."

Only the acts of the principal bind it to the contract, not the acts of the purported agent. *Brunette v. Idaho Veneer Co., supra.* The only indication given to Hieb that Leander was a representative of the Union was Leander's own statement that he was acquiring hay for the Union, to be shipped to Minnesota. Even if the $900 cash paid to Hieb came from the Union, this is not an indicia of apparent authority because Hieb's knowledge of such source derived solely from Leander. Money carries no intrinsic indicia of source.

In summary, we conclude that the trial court erred in holding that Leander had the apparent authority to represent the Union. The record does not disclose that anyone made any representation of fact from the Union to Hieb or acted in any way which would tend to lead Hieb to believe Leander was acting on behalf of the Union with respect to the hay compactor. Consequent-

ly, we find it necessary to reverse the trial court.

■ The Union further contends that the trial court erred in awarding attorney fees to Hieb. Because of our decision here, Hieb is no longer the prevailing party. The trial court's award of attorney fees must also be reversed.

■ In addition, both parties have requested attorney fees on appeal. Such an award will be made if the appeal has been brought, pursued or defended frivolously, unreasonably or without foundation. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). In this case, the Union, which has prevailed on appeal, sought clarification of an existing legal standard which had been misinterpreted by the trial court. We see nothing to indicate that the appeal was defended by Hieb frivolously, unreasonably or without foundation. *Scott v. Castle,* 104 Idaho 719, 662 P.2d 1163 (Ct.App.1983); *Cf. Christensen v. Idaho Land Developers, Inc.,* 104 Idaho 458, 660 P.2d 70 (Ct.App.1983). Accordingly, no attorney fees on appeal will be awarded.

The judgment as to Minnesota Farmers Union is reversed. Costs to appellant.

WALTERS, C.J., and BURNETT, J., concur.