854 P.2d 280

Lee PODOLAN and Dale Podolan,
husband and wife, Plaintiffs–
Appellants,

v.

IDAHO LEGAL AID SERVICES,
INC., Defendant–Respondent.

No. 19630.

Court of Appeals of Idaho.

May 27, 1993.

Risch, Goss & Insinger, P.A., Boise, for appellants. John R. Insinger argued.

Nevin, Kofoed & Herzfeld, Boise, for respondent. David Z. Nevin argued.

WALTERS, Chief Judge.

Lee and Dale Podolan, wife and husband, appeal from the district court's decision granting summary judgment for the respondent, Idaho Legal Aid Services, Inc., (Legal Aid). The Podolans sued Legal Aid claiming it was responsible for deceptions committed by one of its former employees, attorney Michael Donnelly, who had continued a pre-existing attorney-client relationship with the Podolans while working for Legal Aid. The court determined that Legal Aid was not responsible for the unauthorized and unsupervised work Donnelly purported to perform. The Podolans assert that genuine issues of material fact exist to preclude summary judgment, and that the court did not interpret the facts in their favor. We affirm.

## I

### Facts and Procedural Background

Donnelly and the Podolans had an eight year attorney-client relationship in which Donnelly purported to represent them in two lawsuits. Through an elaborate series of lies, forged court documents, false preparations for trial, and false visits to the courthouse, Donnelly led the Podolans into believing he was pursuing their cases when he was not. His misrepresentations were apparently due to a mental illness rather than a desire for personal gain, but nonetheless, the Podolans were injured.

The parties began their association in 1981 when Lee Podolan hired Donnelly to represent her in a sex discrimination case against her former employer, the Tennessee Valley Authority (TVA). Donnelly took the case on an hourly basis, did some work and charged about $1,000. Citing health problems, he relinquished his license to practice law in 1983 and withdrew from practice. Donnelly's law firm told Mrs. Podolan that it would not continue representing her and Mrs. Podolan decided to represent herself. Her strategy was to wait and see what decision was made. On September 16, 1986, the TVA denied her claim.

After the denial, the Podolans contacted Donnelly at his new place of business, the law offices of William F. Lee. When Mrs. Podolan met with Donnelly, he stated that he did not have a license to practice law but he expected it to be restored within two weeks. Actually, it would be several years before his license was reinstated. Nonetheless, Donnelly told Mrs. Podolan that he had been sick, had undergone therapy, and was feeling fine. Not knowing the nature or seriousness of Donnelly's illness, or the exact reasons why he had left the practice of law, the Podolans hired him to file an administrative appeal in the TVA case and, if necessary, to file a complaint in federal district court. Through untimely filings and a failure to serve a summons, the case eventually was dismissed administratively and in federal court. During this time, however, Donnelly told the Podolans the cases were being actively pursued.

In 1987, the Podolans hired Donnelly to represent them in an action against Accent Pool and Spas which allegedly sold them a defective hot tub, and Idaho Power Company, with whom the Podolans financed the purchase. Donnelly never filed any documents in this case and despite his representations to the contrary, no court decisions were made and there were no offers of settlement.

During their association, the Podolans were unaware that after Donnelly's voluntary withdrawal from practice in 1983, he was transferred to "disciplinary inactive

status" with the Idaho State Bar while several disciplinary matters were litigated. In May, 1985, he tendered a Conditional Admission of Misconduct. In September, 1985, Donnelly and the state bar commission agreed that he would be formally suspended for one year beginning retroactively in August, 1985. He was allowed a probationary reinstatement, and was required to obtain malpractice insurance. The Idaho Supreme Court entered a disciplinary order in March 1986, and in January, 1987, entered a Conditional Order of Reinstatement. Among other things, Donnelly was placed on two years probation.

In January 1989, Donnelly was hired as a legal assistant by Legal Aid. In March, 1989, the Supreme Court entered an Amended Conditional Order of Reinstatement allowing Donnelly to practice law only when supervised by a licensed attorney and only after obtaining malpractice insurance. Thereafter, Donnelly recovered his license and became a staff attorney at Legal Aid. The malpractice insurance he obtained only covered services performed for Legal Aid clients. In December, 1989, the Podolans learned that Donnelly had been deceiving them practically from the time they first met. In January 1990, Donnelly resigned from Legal Aid. Although his conditional license to practice law was withdrawn, he continued for a short time to appear in court on other non-Legal Aid cases. The facts we have recounted here are abbreviated—Donnelly's misrepresentations to the Podolans were very numerous, convincingly performed, and dreadful in their falsity.

The Podolans brought this action against Legal Aid in July, 1990, alleging negligent supervision, professional malpractice, fraud, breach of fiduciary duty, bad faith, intentional infliction of emotional distress, and seeking compensatory and punitive damages. Legal Aid answered and deposed the Podolans. The Podolans took no depositions, served no written discovery requests, or otherwise sought to discover facts known to Legal Aid. They filed an amended complaint, which Legal Aid answered. Legal Aid also moved for summary judgment. On September 3, 1991, the district court granted the motion in all respects and entered judgment for Legal Aid. The Podolans appeal, challenging the court's decision on all claims except the one for professional malpractice. On appeal, they attempt to establish, as they did below, that Legal Aid was vicariously liable for Donnelly's actions. We will discuss the Podolans' asserted grounds for vicarious liability before discussing the causes of action presented in their amended complaint.

## II

### Standard of Review

■ Summary judgment is appropriate only when there are no genuine issues of material fact and the case can be decided as a matter of law. I.R.C.P. 56(c); *Moss v. Mid–American Fire and Marine Insurance Co.*, 103 Idaho 298, 302, 647 P.2d 754, 758 (1982); *Whitlock v. Haney Seed Co.*, 110 Idaho 347–48, 715 P.2d 1017–18 (Ct. App.1986). Where, as here, a jury has been requested, the nonmoving party is entitled to the benefit of reasonable inferences drawn from the evidentiary facts. *Anderson v. Ethington*, 103 Idaho 658, 660, 651 P.2d 923, 925 (1982); *Whitlock, supra.* The facts are drawn from a review of the record, consisting of the motions, pleadings, affidavits, depositions, and admissions on file. I.R.C.P. 56(c); *Moss, supra.* Controverted facts are viewed in favor of the party resisting the motion. *Whitlock, supra.*

■ The party opposing the motion may not merely rest on the allegations contained in the pleadings; rather, evidence by way of affidavit or deposition must be produced to contradict the assertions of the moving party. I.R.C.P. 56(e); *Worthen v. State*, 96 Idaho 175, 176, 525 P.2d 957, 958 (1974). Raising the slightest doubt as to the facts is insufficient—a genuine issue of material fact must be presented. *LePelley v. Grefenson*, 101 Idaho 422, 428, 614 P.2d 962, 968 (1980); *but see Sherwood v. Carter*, 119 Idaho 246, 805 P.2d 452 (1991). Disputed facts will not defeat summary judgment when the party oppos-

ing the motion fails to establish the existence of an essential element of his or her case. *Badell v. Beeks*, 115 Idaho 101, 102, 765 P.2d 126, 127 (1988), *citing Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Garzee v. Barkley*, 121 Idaho 771, 774, 828 P.2d 334, 337 (Ct.App. 1992). "In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

### A. Contract

In an attempt to impute Donnelly's action to Legal Aid, the Podolans assert that they had an implied contract with Legal Aid which Donnelly breached when he lied to them. The district court did not expressly rule on whether such a contract existed, but ruled implicitly that it did not in the context of other claims. For the sake of clarity, we examine the assertion separately.

■ There are essentially three types of contractual arrangements: express contracts, contracts implied in fact, and contracts implied in law. *Continental Forest Products, Inc. v. Chandler Supply Company*, 95 Idaho 739, 743, 518 P.2d 1201, 1205 (1974). Express contracts require that the parties expressly agree regarding a transaction. *Id.* Contracts implied in fact are those where there is no express agreement but the conduct of the parties implies an agreement from which the contractual obligation arises. *Id.* To find such a contract, the facts must be such that the intent to make a contract may be fairly inferred. *Lawyers Title Company v. Jacobs*, 102 Idaho 804, 806, 641 P.2d 350, 352 (Ct.App.1982). Contracts implied in law—also known as quasi contracts, unjust enrichment, or restitution—are not contracts at all but are obligations imposed by law to provide a remedy without reference to the intentions or expressions of the parties. *Continental Forest Products, supra. See also* 66 AM.JUR.2d *Restitution and Implied Contracts* § 2 (1973) (including "constructive contracts" as another

term for contracts implied in law). The essence of a contract implied in law is that a party has received a benefit from another which it would be inequitable for him to retain without compensation to the other.

■ No express contract was entered into between the Podolans and Legal Aid. The Podolans never applied to be Legal Aid clients. Mr. Roderick Gere, the Managing Attorney at Legal Aid and Donnelly's supervising attorney, stated in his affidavit that Legal Aid required a specific procedure for opening a case, including having the prospective client fill out an application and provide specific financial information. The staff attorney reviews the documents to confirm that the client is eligible to be represented, and then must complete an opening memorandum summarizing the legal aspects of the case. The Managing Attorney must then approve and sign the application and opening memorandum.

Mr. Gere stated that Donnelly followed the procedure for opening his Legal Aid cases and that he promptly brought all new files to Mr. Gere's attention. Donnelly did not attempt to open files for the Podolans. Mr. Gere stated he was not aware that Donnelly had "any sort of relationship with [them]," nor did Mr. Gere exercise any supervision over Donnelly's handling of the Podolans' cases.

■ Also, there was no contract implied in law. Neither party asserts that one obtained a benefit from the other for which equity should provide remedial recompense.

■ Whether the Podolans had a contract implied in fact with Legal Aid depends on whether the intent to make the contract may be fairly inferred from the facts. The Podolans assert that the contract existed due to Donnelly's conduct and the conduct of Legal Aid's clerical staff who received and gave messages to the Podolans on Donnelly's behalf. Specifically, the Podolans state that they visited Donnelly at Legal Aid from five to seven times between September and December 1989, and that both Podolans made between 50 and 100 calls to Donnelly at Legal Aid during the spring and summer of 1989.

The Podolans' contacts with Donnelly do not establish an intent—in themselves or Legal Aid—to form a contract. As the district court determined, no one with authority to bind Legal Aid to a contract knew of the Podolans except Donnelly. He did not attempt to establish them as Legal Aid clients and when asked by Legal Aid, denied that he was handling outside cases. Although the Podolans conferred with Donnelly at Legal Aid in person and by telephone, for most of the time Donnelly worked there they believed he still worked for attorney William Lee. Mrs. Podolan stated that it was not until "sometime before September of 1989" that she was told by a woman at William Lee's law office that Donnelly no longer worked for Lee. It was then that Mrs. Podolan called Donnelly at Legal Aid and he informed her he would continue to handle her cases. According to Mrs. Podolan, in late April or early May, 1989, Donnelly told her he was merely "helping out at Legal Aid." Mrs. Podolan had signed a fee agreement with Donnelly as a representative of William Lee. The record does not reveal any agreement between Legal Aid and the Podolans. Further, the phony documents Donnelly prepared for the Podolans indicated that the Podolans' attorney was William Lee. Mrs. Podolan's affidavit statement that she "understood" that because Donnelly was associated with Legal Aid, the organization also represented her, is insufficient to manifest intent to become a Legal Aid client. Mrs. Podolan's "understanding" is negated by her statement, dated January 10, 1990, that "we were not a Legal Aid case." The latter statement is supported by Mrs. Podolan's observations about her first visit to Donnelly at Legal Aid in September, 1989. She stated that when she walked in,

> it kind of dawned on me that we were in a place that probably provided cut-rate legal services to poor people, because there were a lot of notices up on the board and quite a few pamphlets on what to do if you're evicted from your mobile home type things and at that point it dawned on me that there was probably some kind of a pro bono type work going on there.

Mrs. Podolan recognized that Legal Aid was designed to provide subsidized legal services to those who could not afford to hire private attorneys. Implicitly, she also recognized that she did not fit the profile. She was Donnelly's longstanding paying client, with a fee agreement with Donnelly and Lee. Ernesto Sanchez, Legal Aid's executive director, stated in his affidavit that Legal Aid is generally prohibited from handling fee-generating cases.

## B. Detrimental Reliance and Promissory Estoppel

■ The Podolans argue that Legal Aid should be estopped from denying liability because they detrimentally relied on Donnelly's actions as an employee. To establish detrimental reliance, a party must show that she reasonably and justifiably relied on a specific promise of the offending party and suffered substantial and foreseeable economic loss when relying on the promise. *See Mohr v. Shultz*, 86 Idaho 531, 540, 388 P.2d 1002, 1008 (1964); *Gilbert v. City of Caldwell*, 112 Idaho 386, 392, 732 P.2d 355, 361 (Ct.App.1987).

■ Here, although Mrs. Podolan may have detrimentally relied on Donnelly, she did not rely on his employment with Legal Aid. No promises were made to the Podolans by Legal Aid and no one told them they were Legal Aid clients. In her deposition, Mrs. Podolan stated she did not care that Donnelly had moved to Legal Aid, "the most important thing was my case was going to be handled." When asked if she changed her course of action or did anything differently once Donnelly went to Legal Aid, she replied "No, I don't believe so." The record establishes that for much of the time she dealt with Donnelly at Legal Aid, Mrs. Podolan believed William Lee was backing Donnelly's actions. Mrs. Podolan relied on her history with Donnelly, not his association with Legal Aid.

## C. Authority

■ Next, the Podolans assert that Donnelly acted as Legal Aid's agent, with authority to bind it to represent the Podolans in non-Legal Aid cases. There are

**944**

three types of agency which when established are sufficient to bind a principal to a contract entered into by an agent with a third party: express, implied, and apparent authority. *Hieb v. Minnesota Farmers Union*, 105 Idaho 694, 697, 672 P.2d 572, 575 (Ct.App.1983). Express authority is articulated between the parties. Implied authority is authority which is necessary, usual, and proper to accomplish or perform the main authority expressly delegated to an agent. *Clark v. Gneiting*, 95 Idaho 10, 12, 501 P.2d 278, 280 (1972). Apparent authority exists where a principal voluntarily places an agent in a position where "a person of ordinary prudence, conversant with the business usages and the nature of the particular business, is justified in believing that the agent is acting pursuant to existing authority." *Id.; Clements v. Jungert*, 90 Idaho 143, 152, 408 P.2d 810, 814 (1965).

 It is undisputed that Donnelly was not expressly authorized to bind Legal Aid in non-Legal Aid cases. Also, there was no implied authority. The authority Legal Aid delegated to Donnelly was to represent Legal Aid clients in properly opened and reviewed Legal Aid cases.

 Further, there was no apparent authority. Apparent authority cannot be created by the acts and statements of the agent alone. *Idaho Title Co. v. American States Ins. Co.*, 96 Idaho 465, 468, 531 P.2d 227, 230 (1975); *Clements, supra; Hieb*, 105 Idaho at 699, 672 P.2d at 577. One must use reasonable diligence to ascertain the agent's authority. *Idaho Title Company, supra*. Reasonable diligence encompasses a duty to inquire with the principal about the agent's authority. *See Chamberlain v. Amalgamated Sugar Co.*, 42 Idaho 604, 612, 247 P. 12, 14 (1926). If no inquiry is made, the third party is chargeable with knowing what kind of authority the agent actually had, if any, "and the fault cannot be thrown on the principal who never authorized the act or contract." *Id.*

Neither Donnelly or anyone else told or represented to the Podolans that they were Legal Aid clients. They merely assumed such was the result of Donnelly having changed offices. However, the facts contradict the assumption. The documents Donnelly prepared for them showed William Lee as their attorney. Although Mrs. Podolan now claims that she "understood" that Legal Aid was her representative, her earlier written comments showed that she did not believe that she was a Legal Aid client. The Podolans did not ask Legal Aid or the state bar office about Donnelly's status as an employee or attorney. Without inquiring, the Podolans are charged with knowing Donnelly's true authority: to work on properly opened and authorized Legal Aid cases.

### D. Respondeat Superior

 The Podolans aver that Legal Aid is liable for Donnelly's acts through the doctrine of *respondeat superior*, which translated means "let the master answer." Black's Law Dictionary, p. 1311 (6th ed. 1990). The doctrine states that an employer or master is responsible for the torts of its employee or servant when the torts are committed within the scope of the employee's or servant's employment. *Smith v. Thompson*, 103 Idaho 909, 911, 655 P.2d 116, 118 (Ct.App.1982), *citing Scrivner v. Boise Payette Lumber Co.*, 46 Idaho 334, 268 P. 19 (1928). The scope of one's employment encompasses

those acts which are so closely connected with what the servant is supposed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of employment.

... [I]n general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master.

*Birkner v. Salt Lake County*, 771 P.2d 1053, 1056 (Utah 1989), *quoting* W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 70 at 502 (5th ed. 1984). *See also* RESTATEMENT (SECOND) OF

AGENCY § 228 (1958). "An employee's purpose or intent, however misguided in its means, must be to further the employer's business interests." *Birkner*, 771 P.2d at 1057. "If the employee acts from 'purely personal motives ... in no way connected with the employer's interest' ... then the master is not liable." *Id.* at 1057, *quoting* PROSSER AND KEETON ON TORTS, § 70 at 506. As a general statement of these rules, Idaho courts have stated that the test for whether an employee was acting within the scope of employment when he committed a tort is the right to control reserved by the employer over the functions and duties of the agent. *Sterling v. Bloom*, 111 Idaho 211, 247–48, 723 P.2d 755, 791–92 (1986) (Huntley, J., concurring) *citing Koch v. Elkins*, 71 Idaho 50, 225 P.2d 457 (1950); *Van Vranken v. Fence–Craft*, 91 Idaho 742, 430 P.2d 488 (1967).

Generally, the issue of whether an employee acted within the scope of employment is a factual question to be decided by the trier of fact. *Birkner*, 771 P.2d at 1057; *Manion v. Waybright*, 59 Idaho 643, 656, 86 P.2d 181, 186 (1938). However, conduct that is clearly outside the scope of employment may properly be decided by the court as a matter of law. *Id.*

Donnelly's conduct was outside the scope of his employment. Although he purported to perform legal work for the Podolans, and occasionally acted on their behalf during working hours while at the offices of Legal Aid, none of his actions were motivated by a desire to serve Legal Aid. The Podolans were Donnelly's personal clients from private practice and he did not intend to make them Legal Aid clients. Donnelly was acting with purely personal motives "in no way connected with the employer's interest."

Further, Legal Aid reserved the right to control Donnelly only as to his performance on Legal Aid business—it accepted no duty to control his personal activities and no such duty was imposed by the state bar or the Supreme Court. The Amended Conditional Order of Reinstatement required that Donnelly perform legal services only while associating with a licensed, supervising attorney, who was to "provide general supervision as to the nature of the legal work performed" but who was not required to countersign pleadings or specifically approve Donnelly's work product.

In correspondence with bar counsel about Donnelly's court appearance in another non-Legal Aid case, Mr. Gere, Donnelly's supervising attorney, responded that he had been unaware of Donnelly's actions and that Mr. Gere's supervision was "confined to work performed in [Donnelly's] capacity as an employee of Idaho Legal Aid Services, Inc." This statement is confirmed by Mrs. Podolan's own statement dated January 10, 1990. Mrs. Podolan wrote that when she went to complain about Donnelly's actions, bar counsel told her that Donnelly's probationary reinstatement was conditioned on the fact that "[Donnelly] work only on Legal Aid cases."

### E. Negligent Supervision

The Podolans asserted in their amended complaint that Legal Aid was liable for Donnelly's acts because he was negligently supervised. They argue that the district court wrongly interpreted the facts when it determined that Legal Aid did not know of Donnelly's extra-curricular activities, and that it cannot restrict its supervision only to Legal Aid cases. They assert that Legal Aid supervisors should have made clerical staff monitor Donnelly's actions. They also argue that when Ernesto Sanchez wrote his May 8, 1989, memorandum requesting Donnelly to provide a list of any non-Legal Aid cases he was working on, Sanchez should not have been satisfied with Donnelly's denial that he was not participating in outside cases. The Podolans aver that Donnelly's history of deception should have alerted Legal Aid that he may not tell the truth.

Negligence requires the Podolans to show that Legal Aid owed them a legal duty to conform to a certain standard of conduct; a breach of that duty; a causal connection between Legal Aid's allegedly negligent conduct and Mrs. Podolan's injury; and damages. *Black Canyon Racquetball v. First National Bank*, 119 Ida-

ho 171, 175–76, 804 P.2d 900, 904 (1991). A duty may arise several ways. In the context of negligent supervision, duty is the product of the supervisor's "special relationship" with the supervised individual, not with the injured person. *Sterling*, 111 Idaho at 225, 723 P.2d at 769; *Litchfield v. Nelson*, 122 Idaho 416, 420, 835 P.2d 651, 655 (Ct.App.1992). The duty requires the supervisor who knows of the supervisee's dangerous propensities to control the supervisee so he will not injure third persons. *Id.* Our Supreme Court has held that the duty described in the RESTATEMENT (SECOND) OF TORTS § 319 applies to questions of negligent supervision in Idaho. *Sterling*, 111 Idaho at 226, 723 P.2d at 770. That section states:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

RESTATEMENT (SECOND) OF TORTS § 319 (1965). Here, there was no bodily harm as contemplated by the *RESTATEMENT* and *Sterling*. But see *Oppenheimer Industries, Inc. v. Johnson Cattle Co., Inc.*, 112 Idaho 423, 431, 732 P.2d 661, 669 (1986) (negligence of brand inspector could be imputed to State Brand Board for property loss in allowing sale of stolen cattle); 57B AM.JUR.2d *Negligence* § 1768 (1989) (citing personal injury, death, and property damage as supporting liability for negligent supervision).

■■■ Further, although Donnelly had been the subject of disciplinary proceedings by the state bar for deceiving former clients, we find no indication in the record that the Podolans produced any evidence regarding the nature of the disciplinary proceedings, how Donnelly mistreated the others, whether they were clients of his firm or "outside" clients, or whether Legal Aid knew or should have known of his actions.

As already discussed, and as the district court determined, the Amended Conditional Order of Reinstatement required that Donnelly work under an attorney who would supervise "the nature of the legal work performed" by Donnelly, not monitor his every move. The supervision was limited to ascertainable Legal Aid cases. The evidence is undisputed that Donnelly performed his Legal Aid assignments well and in that regard did not create concern for his supervising attorney.

As the district court noted Donnelly's manipulations of the Podolans went so far beyond "practicing law" that he appeared to be engaged in a fantasy pursuit which the supervision order did not encompass. Idaho Rule of Professional Conduct 5.1 supports this conclusion. It states that a lawyer shall be responsible for another lawyer's violation of the rules if (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct; or (2) the lawyer is a partner in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action. The evidence presented to the district court clearly shows that Legal Aid did not order or ratify Donnelly's work with the Podolans. Legal Aid also did not know of Donnelly's conduct when its consequences could be avoided or mitigated.

### F. Breach of Fiduciary Duty and Bad Faith

■■■ The Podolans next argue that Donnelly breached his fiduciary duty and dealt with them in bad faith. Before a fiduciary duty can be breached, there must exist a fiduciary relationship. A fiduciary relation exists between two parties when one is under a duty to act or to give advice for the benefit of the other upon a matter within the scope of the relation. RESTATEMENT (SECOND) OF TORTS § 874 comment a (1979).

■■■ It is undisputed that Donnelly, as the Podolans' attorney, was in a fiduciary relationship with them and breached his fiduciary duty. However, there was no attorney-client relationship between Legal Aid and the Podolans. Legal Aid personnel

who were capable of entering into such a relationship with the Podolans did not learn of the Podolans' attorney-client relationship with Donnelly until after Donnelly's house of cards fell. Further, there was no unspecified "special relationship," as argued by the Podolans, which would allow Donnelly's bad faith to be imputed to Legal Aid.

### G. Fraud and Intentional Infliction of Emotional Distress

The torts of fraud and intentional infliction of emotional distress require intent to commit the tort. Although Donnelly intended to deceive the Podolans, Legal Aid did not. Legal Aid also did not intend to cause them emotional distress. Only if Donnelly's intent could be imputed to Legal Aid can the Podolans recover on these claims. We have already determined that no liability could be imputed to Legal Aid.

### III

### Conclusion

On review of this case, we sympathize with the terrible way the Podolans were treated by Donnelly. Sympathy, however, does not create a legal basis for finding Legal Aid vicariously liable. Donnelly's charade was entirely his own. The Podolans have failed to establish essential elements of their claims. Therefore, we must affirm the summary judgment on all claims. Costs to respondent, Idaho Legal Aid Services, Inc. No attorney fees on appeal are awarded.

SWANSTROM, J., and SILAK, Acting Judge, concur.